**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **JOSEPH DAUZAT** | **CIVIL ACTION** |
| **VERSUS** | **NO: 14-239** |
| **BESSIE CARTER, ET AL.** | **SECTION "C" (4)** |

**ORDER**

Before the Court are Defendants, Bessie Carter, Laura Buckley, Dr Casey McVea and Warden Robert Tanner's ("Defendants") **Motion for Reconsideration of the Courts Order to Take Plaintiff to an Orthopedic Specialist (R. Doc. 12)**. The motion is opposed. *See* R. Doc. 14.

## I. Background

Joseph Dauzat ("Dauzat") a fifty one year old man who is housed at Rayburn Correctional Center ("RCC"), filed this *pro se* action against the defendants, Bessie Carter ("Carter"), Nurse Laura Buckley ("Nurse Buckley"), Dr. Casey McVea and Warden Robert Tanner ("Warden Tanner") seeking damages pursuant to §1983 for the deliberate indifference he believes he suffered to his serious medical needs. *See e.g.,* R. Doc. 1.

Dauzat alleges that on March 14, 2013, he fell while participating in the prison's wellness program. He alleges that he complained to the Health Care Unit at RCC about numbness in his back and neck. The medical records reveal that he was seen in the medical unit for the first time on March 17, 2013, and he was observed to have a limp and his right food was turned outward. The

medical records further evidence that Nurse Buckley noted that while Dauzat was able to swing both his legs across and up onto the table while lying down, as well as remove his shoes, he complained that his legs from the knee up and his right arm were numb. Nurse Buckley characterized Dauzat's neck pain as an after thought.[1] Dauzat requested the opportunity to be evaluated at a hospital because his pain was worsening despite the medications he had been given, but Nurse Buckley characterized his complaint as "routine."[2]

On March 31, 2013, Dauzat's medical records evidence that he was again seen on an emergency basis by Nurse Buckley. During this visit he complained that he was not feeling well and suggested that he needed to lie down. Nurse Buckley noted that Dauzat complained of nausea, sweating, and that he had recently passed out. Dauzat also advised Nurse Buckley that he is still having the same problem from his last visit. On examination, Nurse Buckley concluded that Dauzat did not appear to be in any apparent distress at the time of his visit. She noted that he was alert, oriented and stable. She noted that his lungs were clear, he was not sweating, his pupil's were equal and responsive with no sign or symptom of nausea and vomiting. She concluded that no treatment was necessary and he returned to the dorm.[3]

On April 3, 2013, Dauzat was seen by the medical department at RCC. During this visit Dauzat's complaints increased to include numbness in his feet, his hands, and in his legs. He complained that these symptoms had begun three to four weeks earlier.[4] He alleges that the problem

---

[1] *See* R. Doc. 13-2, p. 121, Dauzat Medical Records, 0398.

[2] *Id.*

[3] *Id.* at p. 120; Dauzat Medical Records, 0397.

[4] *Id.* at p. 119; Dauzat Medical Records, 0396.

progressed to his left hand one week earlier, and that he could no longer feel his feet, which makes walking difficult. Dauzat complained of shocking pain in his back and neck that traveled down to his feet whenever he bent his neck.[5] The evaluating nurse observed that he had an awkward gate, but that he had equal strength in both hands. The nurse also found that Dauzat had difficulty using his hands and could not write well. An appointment was scheduled for him for April 10, 2013.[6]

On April 4, 2013, Dauzat was seen by Dr. McVea, who recorded a history of syncopal episodes on December 20, 2013, December 24, 2013, and January 30, 2014. Hypertension was noted on all of these occasions. The doctor also noted that on all these occasions Dauzat complained of progressive numbness and weakness in his lower extremities, stating that he could not feel his feet when he walked. Dauzat was assessed that day and the doctor noted that neurologically, his ankle reflexes showed sustained clonus on forced dorsiflexion of the ankle. His gait was markedly ataxic while he tried to "feel" for the floor. The doctor also noted that upon examination, Dauzat had decreased strength in all of his extremities.

After examining him, the doctor issued orders for Dauzat to be transferred immediately to the Emergency Room at the Louisiana State University Hospital ("LSU") due to his experience of syncopal episodes.[7] He was evaluated at the LSU Health Interim Public Hospital as a result of his complaint of weakness and decreased sensation to his hands and his feet.[8]

At this time, Dauzat was diagnosed with significant, severe stenosis of his cervical spine. He was seen by the neurosurgery department and evaluated for possible surgery of his cervical spine.

---

[5]*Id.*

[6]*Id.* at p. 120.

[7]*Id.* at p. 109; Dauzat Medical Records, 0386.

[8]*Id.* at p. 107; Dauzat Medical Records, 0384.

Dauzat also obtained an MRI, which revealed that he had congenital narrowing of the AP diameter of the Spinal Canal with multi-level posterior disc bulges producing regions of severe canal stenosis, cord contact and cord signal alterations, consistent with myleomalacia/cord edema[9] which was representative of critical stenosis.[10]

As a result of the diagnostic tests and his evaluation, Dauzat was prescribed medication for his pain, as well as recommended for surgery of his cervical spine by the neurosurgeon. The neurosurgeon noted that there should be fall precautions and close follow up of Dauzat along with the administration of his pain medication.

On April 5, 2013, Nurse Temples noted that she attempted to get in contact with the neurosurgeon but was advised that he would not be in a position to see Dauzat until April 19, 2013. She advised LSU about the emergent nature of the situation, and also sent an email to the Wardens regarding the same. Dauzat was thereafter seen on April 15, 2014, for a neurosurgery consult and instructed to return on May 6, 2013.[11] He was diagnosed with a disorder of the spinal cord in the neck.[12]

Dauzat was scheduled for a posterior cervical laminectomy and fusion to take place at a later date. However, due to his condition, his surgery was pushed up, and his procedure was completed

---

[9] Myelomalacia is a pathological term referring to the softening of the spinal courd. Hemorrhagic infarction of the spinal cord can occur as a sequel to acute injury such as tht caused by intervertebral dis extrusion. This condition causes impairment of motor function in the lower extremities, below normal or absence of reflexes of the pelvic limbs and anus, loss of deep pain perception toward the coccyx to the site of spinal cord injury, muscular atrophy or wasting away of muscle tissue depressed mental state and respiratory difficulty due to muscles that run between the ribs and diaphragmatic paralysis. http://en.wikipedia.org/wiki/Myelomalacia, 07/01/14.

[10] *See* R. Doc. 13-2, p. 110; Dauzat Medical Records, 0387.

[11] *Id.* at p. 105; Dauzat Medical Records, 0380.

[12] *See* R. Doc. 13-2, p. 101; Dauzat Medical Records, 0378.

on April 23, 2013. Dauzat's surgery consisted of a C3-6 posterior laminectomy and fusion.

Dauzat had a post-operation visit on May 20, 2013, where he complained of some neck, and residual right arm pain, as well as leg weakness or paresthesia, more so on the right side.[13] The post operative orders required Dauzat to receive physical therapy daily at the facility, and required the administration of ibuprofen and neurontin. Dauzat was also instructed to return for a post-operation visit in six months.[14]

The medical records evidence that Dr. McVea accepted the post-operation Orders, but later changed the order requiring daily physical therapy at the facility to BCMC for Physical Therapy.[15] On that same day, Dr. McVea ordered one pair of DARCO Gentle Step Extra Depth Shoe.[16]

Dauzat inquired about physical therapy with the doctor and was advised that RCC did not have physical therapy services available at that time. Dr. McVea instructed Nurse Temples to inform Dauzat to begin participating in the wellness program and recommended that he perform a gentle range of motion exercises as tolerated along with strengthening exercises. [17]

Dauzat's complaint of numbness in his hands and feet as well as neck shoulder and back continued. On July 1, 2013, during a subsequent doctor's visit, Dauzat restated these complaints to the treating physician. The physician noted that while there was residual spacticity, he was referred to physical therapy for rehabilitation training, and he was instructed to rest in his bunk as needed. The record noted that he was ready for discharge on July 1, 2013. His prescription for Ultram and

---

[13] *Id.* at p. 75; Dauzat Medical Records, 0352.

[14] *Id.*

[15] *Id.* at p. 74.

[16] *Id.* at p. 72; Dauzat Medical Records, 0349.

[17] *Id.* at p. 69; Dauzat Medical Records, 0346.

Neurontin were continued.

Dauzat's complaint of numbness continued. He was referred to a medical doctor and awaited an appointment on August 29, 2013. On August 28, 2013, Dauzat was seen after being involved in a fight. He denied injuries and he reported that he hit the other inmate because he was afraid. The records from this visit indicate that Dauzat's neck pain was again reported and appeared to be a chronic issue, as he again requested pain medication.[18]

Dauzat was seen by the doctor on August 29, 2013, with complaints of increased pain from the neck down between shoulder blades. Involuntary movement of his arms and legs here also noted. The record further indicates that Dauzat was moved to the Sun Unit on September 3, 2013. On September 3, 2013, Dauzat complained of increased neck pain and decreased shoulder blade pain. Involuntary movements of the arms and legs were noted. Dauzat complained that spacticity was worse upon awakening. On observation, Dr. McVea noted that there was spastic gait, increased deep tendon reflex with bilateral decrease of the lower extremities.[19]

On September 16, 2013, Dauzat was seen again at LSU by a resident physician who noted that Dazuat continued to complain of persistent right upper extremity and left hand paresthesias, neck pain radiating to shoulders and bilateral lower extremity pain.[20] The resident noted that Dauzat had not had access to physical therapy secondary to incarceration, but was ambulating with a walker and denied falls.[21] The resident indicated that she instructed Dauzat on safe exercises he could do

---

[18]*See* R. Doc. 13-2, p. 61; Dauzat Medical Records, 0338.

[19]*Id.* at p. 13-2, p. 59; Dauzat Medical Records, 0336.

[20]*See* R. Doc. 13-2, p. 58; Dauzat Medical Records, 0335.

[21]*Id.*

in the absence of physical therapy availability.[22]

Dauzat complained of numbness, difficulty walking, radiating pain in the neck and lower extremity continued through January 2014 at which time he was given a knee brace for his right knee.[23] On March 5, 2014, was seen at Elayn Hunt Correctional Center for a CT of the neck without contrast.[24] On March 17, 2014 a telemed assessment was done. The telemed doctor noted that a CT of the C-Spine was completed and it was noted that the decompression looks very good, the instrumentation was in position, alignment was good, the fusion looked good and he was overall doing well with no need for continued follow up. The doctor noted that he could return if there were problems.[25]

The final report by radiologist Dr. Hudkins, concluded that there were degenerative changes with mild narrowing of the neural foramina from C7 to T2. He further noted the presence of lucence across the bilateral C7 inferior articulating processes, which he concluded were likely unfused old fractures with secondary degenerative changes and recommended that a clinical correlation take place.

On April 8, 2014, the undersigned conducted a *Spears* hearing with Dauzat, who advised the Court of his continued difficulty walking and the lack of medically ordered physical therapy to assist him with the healing process post surgery. Given the nature of Dauzat's complaints, the undersigned issued an order requiring RCC to have him evaluated by an orthopedic specialist at University Hospital as soon as possible. *See* R. Doc. 11.

---

[22]*Id.*

[23]*Id.* at p. 47-57, Dauzat Medical Records, 0324-0332.

[24]*Id.* at 43, Dauzat Medical Records, 0320.

[25]*Id.* at p. 37; Dauzat Medical Records, 0314.

On April 15, 2014 after the undersigned required Dauzat be evaluated by an orthopedic specialist, the defendants filed the subject motion seeking reconsideration of this Court's order. *See* R. Doc. 12. In so doing the defendants provided the undersigned with a copy of the medical records which evidenced the treatment provided to Dauzat. *See* R. Doc. 13. The defendants suggest that the Telemed Physician's opinion that the fusion "looked good on the CT" and that "no further follow up review" was necessary, indicates that Court's decision is in error. However for the reasons assigned below, the Court disagrees with this suggestion.

## II. Standard of Review

No Federal Rule of Civil Procedure ("Rule") "provide[s] for a 'Motion for Reconsideration' but such motions may properly be considered either a Rule 59(e) motion to alter or amend judgment or a Rule 60(b) motion for relief from judgment." *Hamilton Plaintiffs v. Williams Plaintiffs*, 147 F.3d 367, 371 n.10 (5th Cir. 1998). However, reconsideration of judgments under Rule 59(e) is an extraordinary remedy, which should be used sparingly. *See Templet v. HydroChem Inc.*, 367 F.3d 473, 479-480 (5th Cir. 2004). Specifically, it "is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment." *Id.* at 478 (citation omitted). Instead, it "serve[s] the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." *Id.* at 479. "A Rule 59(e) motion should only be granted where there is new evidence that (1) probably changes the outcome of the case; (2) could not have been discovered earlier by proper diligence; and (3) is not merely cumulative or impeaching." *Molina v. Equistar Chemicals LP*, 261 Fed. App'x 729, 733 (5th Cir. 2008).

## III. Analysis

The defendants contend that Dauzat has no need for an orthopedic specialist to examine him. Rather, the defendants suggest that although Dauzat may have an orthotic need, it has already been satisfied because he has been provided with orthotics. The defendants also contend that Dauzat was evaluated by a neurosurgeon one month before the Court ordered he be evaluated by an orthopedic specialist, and thus, they suggest that no further follow up is necessary.

The Court has extensively reviewed the medical treatment received by Dauzat from the inception of his medical problem. Most notably, the Court found that immediately after the surgery was completed in May 20, 2013, Dauzat began complaining of residual right arm and leg weakness or paresthesia which was greater on the right than the left. These complaints continue through present day. Although the operating physician referred Dauzat to physical therapy, he has not been provided such treatment according the medical records. Instead, Dauzat was sent to the prison's wellness program and advised on how to perform certain exercises.

Four months after the surgery was performed, Dauzat was seen by a neurosurgery resident who observed his physical limitations. By this time, the prison provided him with a walker and again the resident recommended physical therapy. However, in lieu of this recommendation, the prison physician did not permit Dauzat to obtain physical therapy, and instead, instructed him to try safe exercises.

The medical records further evidence that the only other instance in which Dauzat was seen by the prison physician, was when he was sent to Elayn Hunt Correctional for a CT scan of the neck. However, contrary to the mis-belief of the defendants, he was not seen by a neurosurgeon, nor was he evaluated by an orthopedic specialist.

The Court also reviewed Dr. McVea's affidavit and notes that as a family specialist he is not

an orthopedic specialist, nor is he a neurologist. As such, the Court gives little weight to his opinon that no further medical care is needed. The Court further takes issue with Dr. Mc Vea's conclusion that the ambulatory issues that Dauzat experiences are the result of neurological damage, as there is no evidence that any neurological tests having been performed post-surgery to explain the physical limitations for which Dauzat complains. The Court notes that Dauzat had complaints of numbness in both feet pre-surgery. Although the Court recognizes that these symptoms are somewhat improved on the right leg, they are still present in the left. The records further evidence that the radiologist who performed the CT scan concluded that there was evidence of lucence at the C7 level, which should be clinically correlated. No such clinical correlation has yet taken place.

Although the defendants further argue that taking Dauzat to the doctor and / or to physical therapy presents a security risk, the Court finds that this reasoning is not persuasive, as the defendants have characterized and acknowledged, that Dauzat suffered from a serious medical condition for which he had a significant surgery and now uses a walker to ambulate. Therefore, the Court finds that the likelihood that Dauzat would create a security risk to obtain medical treatment is slight to none.

Thus the Court finds that the court’s previous Order shall not be reconsidered, and the prison shall schedule a visit with an orthopedic specialist and neurologist for an assessment of Dauzat's complaints of numbness and residual right arm and leg weakness, as described above. It is further ordered that the cost of doing so shall be born by RCC.

## IV. Conclusion

**IT IS ORDERED** that the Defendants’ **Motion for Reconsideration of the Court's Order to take Plaintiff to an Orthopedic Specialist (R. Doc. 12)** is **DENIED.**

**IT IS FURTHER ORDERED** that Dauzat is required to be scheduled for an evaluation by an orthopedic specialist and neurologist **no later than fifteen (15) days from the issuance of this Order.**

New Orleans, Louisiana, this 7th day of July 2014.

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**