## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

JOSEPH DAUZAT                                    CIVIL ACTION

VERSUS                                           NO:    14-0239

BESSIE CARTER, ET AL.                            SECTION: "C" (4)

### REPORT AND RECOMMENDATION

Before the Court is a **Motion to Dismiss Based on Sovereign Immunity and Qualified Immunity (R. Doc. 19**) filed by the defendants, Bessie Carter, RN, Laura Buckley, LPN, Dr. Casey McVea, and Warden Robert Tanner, seeking dismissal of plaintiff's claims against these defendants pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim for which relief can be granted. The motion and the entire matter were referred to a United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), § 1915e(2), and § 1915A, and as applicable, 42 U.S.C. § 1997e(c)(1) and (2). On April 8, 2014, the Court conducted a hearing pursuant to *Spears v. McCotter*,[1] and its progeny, with the plaintiff and counsel for the defendants participating by conference telephone call. Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing.

## I.    Factual Background

The Court previously set forth in great detail the factual background of Joseph Dauzat's ("Dauzat") claim in its July 7, 2014 Order (R. Doc. 16) denying the defendants' Motion for

---

[1] 766 F.2d 179 (5th Cir. 1985). The purpose of the *Spears* Hearing is to ascertain what the plaintiff is alleging and the legal basis for the claims. The information elicited at the hearing is in the nature of an amended complaint or a more definite statement under Fed. R. Civ. P. 12(e). *Wilson v. Barientos*, 926 F.2d 480, 482 (5th Cir. 1991).

Reconsideration of the Courts Order to Take Plaintiff to an Orthopedic Specialist (R. Doc. 12). As such, the following are the facts from the July 7, 2014 Order.

Dauzat a fifty one year old man who is housed at Rayburn Correctional Center ("RCC"), filed this *pro se* action against the defendants, Bessie Carter ("Carter"), Nurse Laura Buckley ("Nurse Buckley"), Dr. Casey McVea and Warden Robert Tanner ("Warden Tanner") seeking damages pursuant to §1983 for the deliberate indifference he believes he suffered to his serious medical needs.[2]

Dauzat alleges that on March 14, 2013, he fell while participating in the prison's wellness program. He alleges that he complained to the Health Care Unit at RCC about numbness in his back and neck. The medical records reveal that he was seen in the medical unit for the first time on March 17, 2013, and he was observed to have a limp and his right foot was turned outward. The medical records further evidence that Nurse Buckley noted that while Dauzat was able to swing both his legs across and up onto the table while lying down, as well as remove his shoes, he complained that his legs from the knee up and his right arm were numb. Nurse Buckley characterized Dauzat's neck pain as an afterthought.[3] Dauzat requested the opportunity to be evaluated at a hospital because his pain was worsening despite the medications he had been given, but Nurse Buckley characterized his complaint as "routine."[4]

On March 31, 2013, Dauzat's medical records evince that he was again seen on an emergency basis by Nurse Buckley. During this visit he complained that he was not feeling well and suggested that he needed to lie down. Nurse Buckley noted that Dauzat complained of nausea, sweating, and that he had recently passed out. Dauzat also advised Nurse Buckley that he

---

[2] *See e.g.*, R. Doc. 1.

[3] *See* R. Doc. 13-2, p. 121, Dauzat Medical Records, 0398.

[4] *Id.*

is still having the same problem from his last visit. On examination, Nurse Buckley concluded that Dauzat did not appear to be in any apparent distress at the time of his visit. She noted that he was alert, oriented and stable. She noted that his lungs were clear, he was not sweating, his pupil's were equal and responsive with no sign or symptom of nausea and vomiting. She concluded that no treatment was necessary and he returned to the dorm.[5]

On April 3, 2013, Dauzat was seen by the medical department at RCC. During this visit Dauzat's complaints increased to include numbness in his feet, his hands, and in his legs. He complained that these symptoms had begun three to four weeks earlier.[6] He alleges that the problem progressed to his left hand one week earlier, and that he could no longer feel his feet, which makes walking difficult. Dauzat complained of shocking pain in his back and neck that traveled down to his feet whenever he bent his neck.[7] The evaluating nurse observed that he had an awkward gait, but that he had equal strength in both hands. The nurse also found that Dauzat had difficulty using his hands and could not write well. An appointment was scheduled for him for April 10, 2013.[8]

On April 4, 2013, Dauzat was seen by Dr. McVea, who recorded a history of syncopal episodes on December 20, 2012, December 24, 2012, and January 30, 2013. Hypertension was noted on all of these occasions. The doctor also noted that on all these occasions Dauzat complained of progressive numbness and weakness in his lower extremities, stating that he could not feel his feet when he walked. Dauzat was assessed that day and the doctor noted that neurologically, his ankle reflexes showed sustained clonus on forced dorsiflexion of the ankle.

---

[5] *Id.* at p. 120; Dauzat Medical Records, 0397.

[6] *Id.* at p. 119; Dauzat Medical Records, 0396.

[7] *Id.*

[8] *Id.* at p. 120.

His gait was markedly ataxic while he tried to "feel" for the floor. The doctor also noted that upon examination, Dauzat had decreased strength in all of his extremities.

After examining him, the doctor issued orders for Dauzat to be transferred immediately to the Emergency Room at the Louisiana State University Hospital ("LSU") due to his experience of syncopal episodes.[9] He was evaluated at the LSU Health Interim Public Hospital as a result of his complaint of weakness and decreased sensation to his hands and his feet.[10]

At this time, Dauzat was diagnosed with significant, severe stenosis of his cervical spine. He was seen by the neurosurgery department and evaluated for possible surgery of his cervical spine. Dauzat also obtained an MRI, which revealed that he had congenital narrowing of the AP diameter of the Spinal Canal with multi-level posterior disc bulges producing regions of severe canal stenosis, cord contact and cord signal alterations, consistent with myleomalacia/cord edema[11] which was representative of critical stenosis.[12]

As a result of the diagnostic tests and his evaluation, Dauzat was prescribed medication for his pain, as well as recommended for surgery of his cervical spine by the neurosurgeon. The neurosurgeon noted that there should be fall precautions and close follow-up of Dauzat along with the administration of his pain medication.

On April 5, 2013, Nurse Temples noted that she attempted to get in contact with the neurosurgeon but was advised that he would not be in a position to see Dauzat until April 19,

---

[9] *Id.* at p. 109; Dauzat Medical Records, 0386.

[10] *Id.* at p. 107; Dauzat Medical Records, 0384.

[11] Myelomalacia is a pathological term referring to the softening of the spinal cord. Hemorrhagic infraction of the spinal cord can occur as a sequel to acute injury such as that caused by intervertebral disc extrusion. This condition causes impairment of motor function in the lower extremities, below normal or absence of reflexes of the pelvic limbs and anus, loss of deep pain perception toward the coccyx to the site of spinal cord injury, muscular atrophy or wasting away of muscle tissue depressed mental state and respiratory difficulty due to muscles that run between the ribs and diaphragmatic paralysis. http://en.wikipedia.org/wiki/Myelomalacia, 07/01/14.

[12] *See* R. Doc. 13-2, p. 110; Dauzat Medical Records, 0387.

2013. She advised LSU about the urgent nature of the situation, and also sent an email to the Wardens regarding the same. Dauzat was thereafter seen on April 15, 2014, for a neurosurgery consult and instructed to return on May 6, 2013.[13] He was diagnosed with a disorder of the spinal cord in the neck.[14]

Dauzat was scheduled for a posterior cervical laminectomy and fusion to take place at a later date. However, due to his condition, his surgery was pushed up, and his procedure was completed on April 23, 2013. Dauzat's surgery consisted of a C3-6 posterior laminectomy and fusion.

Dauzat had a post-operation visit on May 20, 2013, where he complained of some neck, and residual right arm pain, as well as leg weakness or paresthesia, more so on the right side.[15] The post operative orders required Dauzat to receive physical therapy daily at the facility, and required the administration of ibuprofen and neurontin. Dauzat was also instructed to return for a post-operation visit in six months.[16]

The medical records evince that Dr. McVea accepted the post-operation orders, but later changed the order requiring daily physical therapy at the facility to BCMC for Physical Therapy.[17] On that same day, Dr. McVea ordered one pair of DARCO Gentle Step Extra Depth Shoe.[18]

Dauzat inquired about physical therapy with the doctor and was advised that RCC did not have physical therapy services available at that time. Dr. McVea instructed Nurse Temples to

---

[13] *Id.* at p. 105; Dauzat Medical Records, 0380.

[14] *See* R. Doc. 13-2, p. 101; Dauzat Medical Records, 0378.

[15] *Id.* at p. 75; Dauzat Medical Records, 0352.

[16] *Id.*

[17] *Id.* at p. 74.

[18] *Id.* at p. 72; Dauzat Medical Records, 0349.

inform Dauzat to begin participating in the wellness program and recommended that he perform a gentle range of motion exercises as tolerated along with strengthening exercises.[19]

Dauzat's complaint of numbness in his hands and feet as well as neck shoulder and back continued. On July 1, 2013, during a subsequent doctor's visit, Dauzat restated these complaints to the treating physician. The physician noted that while there was residual spacticity, he was referred to physical therapy for rehabilitation training, and he was instructed to rest in his bunk as needed. The record noted that he was ready for discharge on July 1, 2013. His prescription for Ultram and Neurontin were continued.

Dauzat's complaint of numbness continued. He was referred to a medical doctor and awaited an appointment on August 29, 2013. On August 28, 2013, Dauzat was seen after being involved in a fight. He denied injuries and he reported that he hit the other inmate because he was afraid. The records from this visit indicate that Dauzat's neck pain was again reported and appeared to be a chronic issue, as he again requested pain medication.[20]

Dauzat was seen by the doctor on August 29, 2013, with complaints of increased pain from the neck down between shoulder blades. Involuntary movement of his arms and legs were also noted. The record further indicates that Dauzat was moved to the Sun Unit on September 3, 2013. On September 3, 2013, Dauzat complained of increased neck pain and decreased shoulder blade pain. Involuntary movements of the arms and legs were noted. Dauzat complained that spacticity was worse upon awakening. On observation, Dr. McVea noted that there was spastic gait, increased deep tendon reflex with bilateral decrease of the lower extremities.[21]

---

[19] *Id.* at p. 69; Dauzat Medical Records, 0346.

[20] *See* R. Doc. 13-2, p. 61; Dauzat Medical Records, 0338.

[21] *Id.* at p. 13-2, p. 59; Dauzat Medical Records, 0336.

On September 16, 2013, Dauzat was seen again at LSU by a resident physician who noted that Dazuat continued to complain of persistent right upper extremity and left hand paresthesias, neck pain radiating to shoulders and bilateral lower extremity pain.[22] The resident noted that Dauzat had not had access to physical therapy secondary to incarceration, but was ambulating with a walker and denied falls.[23] The resident indicated that she instructed Dauzat on safe exercises he could do in the absence of physical therapy availability.[24]

Dauzat complaints of numbness, difficulty walking, radiating pain in the neck and lower extremity continued through January 2014 at which time he was given a knee brace for his right knee.[25] On March 5, 2014, Dauzat was seen at Elayn Hunt Correctional Center for a CT of the neck without contrast.[26] On March 17, 2014 a telemed assessment was done. The telemed doctor noted that a CT of the C-Spine was completed and it was noted that the decompression looks very good, the instrumentation was in position, alignment was good, the fusion looked good and he was overall doing well with no need for continued follow up. The doctor noted that he could return if there were problems.[27]

The final report by radiologist Dr. Hudkins on March 5, 2014, concluded that there were degenerative changes with mild narrowing of the neural foramina from C7 to T2. He further noted the presence of lucence across the bilateral C7 inferior articulating processes, which he concluded were likely unfused old fractures with secondary degenerative changes and

---

[22] *See* R. Doc. 13-2, p. 58; Dauzat Medical Records, 0335.

[23] *Id.*

[24] *Id.*

[25] *Id.* at p. 47-57, Dauzat Medical Records, 0324-0332.

[26] *Id.* at 43, Dauzat Medical Records, 0320.

[27] *Id.* at p. 37; Dauzat Medical Records, 0314.

recommended that a clinical correlation take place. The medical records, however, do not indicate a clinical correlation occurred.

### A.   <u>Complaint</u>

Dauzat filed his complaint on January 31, 2014 alleging deliberate medical indifference in violation of the Eighth Amendment's proscription against cruel and unusual punishment pursuant to the United States Supreme Court's decision in *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285 (1976).[28]

In Dauzat's complaint, he alleges that Nurse Buckley violated his constitutional rights when she failed to immediately refer him to a physician during his initial visit with her after he sustained his injury.[29] Dauzat alleges that Nurse Buckley was dismissive during his initial visit on March 17, 2013 by forcing him to walk while he was in pain, concluding that he "pulled something" without thoroughly examining him, and refusing to call a physician despite is repeated request.[30] Dauzat alleges that Nurse Buckley was similarly dismissive during a second visit on March 31, 2013 when she exclaimed "he is faking" and sent him back to the dorm after she checked his vital signs.[31]

Dauzat alleges that Dr. McVea was deliberately indifferent to his medical condition by failing to provide him adequate physical therapy after his surgery. Dauzat alleges that Dr. McVea prescribed course of physical therapy, including that he squeeze a clay putty ball every night for fifteen (15) minutes, was grossly inadequate given his medical condition.[32] Dauzat alleges that Dr. McVea denied him conventional physical therapy and prescribed him therapy through the

---

[28] *See* R. Doc. 1, at p. 15.

[29] *Id.* at pp. 16-17.

[30] *Id.* at pp. 5-6.

[31] *Id.* at p. 7.

[32] *Id.* at pp. 15-16, 18.

Wellness Program, which did not include a professional physical therapist or a medical professional to guide him on proper techniques.[33]

Dauzat also alleges medical indifference against Carter and Warden Tanner. Dauzat alleges that Carter failed to immediately intervene as the Director of Nursing and Unit Head of RCC Medical Department, which caused him to be subjected to severe pain.[34]  Dauzat alleges that Warden Tanner failed to act as "superior authority" or to intervene by taking corrective action to prevent his medical staff from unreasonably delaying medical care and treatment.[35]

### B.      *Spears* Hearing

On April 8, 2014, the undersigned conducted a *Spears* Hearing with Dauzat, who advised the Court of his continued difficulty walking and the lack of medically ordered physical therapy to assist him with the healing process post-surgery. Given the nature of Dauzat's complaints, the undersigned issued an Order (R Doc. 11) requiring RCC to have him evaluated by an orthopedic specialist at University Hospital as soon as possible.

On April 15, 2014, the defendants filed a motion seeking reconsideration of this Court's Order from the *Spears* Hearing.[36] In so doing, the defendants provided the undersigned with a copy of the medical records which evinced the treatment provided to Dauzat.[37] The defendants suggested that the Telemed Physician's opinion that the fusion "looked good on the CT" and that "no further follow up review" was necessary, indicates that the Court's decision was in error. The defendants additionally argued that Dauzat's orthopedic need had already been satisfied because he has been provided with orthotics.

---

[33] *Id.* at p. 10.

[34] *Id.* at p. 17.

[35] *Id.* at pp. 17, 20.

[36] *See* R. Doc. 12.

[37] *See* R. Doc. 13.

The Court denied the defendants' motion for reconsideration after an extensive review of Dauzat's medical records.[38] The Court noted that immediately after surgery was completed in May 2013, Dauzat began experiencing residual right arm and leg weakness or paresthesia, which continued through the time of the order. The Court found that although physical therapy was recommended by the operating physician and a neurosurgery resident four months after surgery, in lieu of the recommendations, Dauzat was sent to the prison's offender led wellness program.

After reviewing the affidavit of Dr. McVea, who acknowledged that he was not an orthopedic specialist or a neurologist, the Court took issue with Dr. McVea's conclusion that the ambulatory issues that Dauzat experienced were the result of neurological damage because there was no evidence of any neurological tests having been performed post-surgery. The Court also noted that the records indicated that the radiologist who performed the CT scan concluded that there was evidence of lucence at the C7 level that should be clinically correlated, but no such clinical correlation had yet taken place.

In addition to denying the defendants' motion for reconsideration, the Court ordered that Dauzat be scheduled for an evaluation by an orthopedic and neurologist no later than fifteen (15) days after the order was issued. According to the medical records submitted with the defendants' motion to dismiss (R. Doc. 19), over a year after Dauzat's surgery on May 20, 2013, Dauzat saw an orthopedist at Elayn Hunt Correctional Center on July 21, 2014 and a neurosurgeon at Interim LSU Hospital on August 4, 2014.

After examining Dauzat and obtaining his medical history, the orthopedist's impression was that Dauzat likely had spinal cord lesions and residual deficits.[39] He recommended that Dauzat continue to use the walker, attend neuro physical therapy, and be referred to LSU

---

[38] *See* R. Doc. 16.

[39] *See* R. Doc. 19-3, at 34.

neurosurgery for recheck.[40] Dr. McVea accepted the orthopedist's orders without changes, but notably, RCC's internal summary of the orthopedist's orders did not include his order that Dauzat attend neuro physical therapy.[41]

Pursuant to the Court's order and the orthopedist's referral, Dauzat was seen by a neurosurgeon who indicated that Dauzat complained of continued numbness in hands, unsteady gait, and numbness in his legs, which Dauzat indicated was getting worse.[42] According to the neurosurgeon's notes, Dauzat's sensation was grossly intact in all extremities, but he complained of decreased sensation, and had progressive numbness in his upper extremities and lower extremities. The neurosurgeon ordered a CT Myelogram C spine, a CT from an outside hospital, and for Dauzat to return in five (5) to six (6) weeks with the CT Myelogram images and CT from outside hospital on a disc.[43] Dr. McVea accepted the neurosurgeon's orders without changes on RCC's internal summary of the orders, but the medical records do not indicate whether Dr. McVea complied with any of the orders as the medical records stop at this note and there has been no supplement.

## II.    Standard of Review

### A.    Review for Frivolousness

Title 28 U.S.C. §§ 1915A and Title 42 U.S.C. §§ 1997e(c) require the Court to *sua sponte* dismiss cases filed by prisoners proceeding *in forma pauperis* upon a determination that they are frivolous.  The Court has broad discretion in determining the frivolous nature of the complaint. *See Cay v. Estelle*, 789 F.2d 318 (5th Cir. 1986), *modified on other grounds*; *Booker v. Koonce*, 2

---

[40] *Id.*

[41] *Id.* at 33.

[42] *Id.* at 21.

[43] *Id.* at 22.

F.3d 114 (5th Cir. 1993). However, the Court may not *sua sponte* dismiss an action merely because of questionable legal theories or unlikely factual allegations in the complaint.

Under this statute, a claim is frivolous only when it lacks an arguable basis either in law or in fact. *Neitzke v. Williams*, 490 U.S. 319 (1989); *Talib v. Gilley*, 138 F.3d 211, 213 (5th Cir. 1998). A claim lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as if the complaint alleges the violation of a legal interest which clearly does not exist. *Harper v. Showers*, 174 F.3d 716, 718 (5th Cir. 1999). It lacks an arguable factual basis only if the facts alleged are "clearly baseless," a category encompassing fanciful, fantastic, and delusional allegations. *Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992); *Neitzke*, 490 U.S. at 327-28. Therefore, the Court must determine whether the plaintiff's claims are based on an indisputably meritless legal theory or clearly baseless factual allegations. *Reeves v. Collins*, 27 F.3d 174, 176 (5th Cir. 1994); *see Jackson v. Vannoy*, 49 F.3d 175, 176-77 (5th Cir. 1995); *Moore v. Mabus*, 976 F.2d 268, 269 (5th Cir. 1992).

**B.**   **Motion to Dismiss**

Under Rule 12(b)(1) and (6), the Court may dismiss a complaint if it lacks jurisdiction over the subject matter or for failure to state a claim upon which any relief may be granted. *See* Fed. R. Civ. P. 12(b)(1), (6). The same standard is applied for a motion to dismiss brought under either Rule 12(b)(1) for lack of jurisdiction or under Rule 12(b)(6) for failure to state a claim for which relief can be granted. *Benton v. United States*, 960 F.2d 19, 21 (5th Cir. 1992).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court must accept all well-pleaded facts as true, viewing the complaint in the light most favorable to

the plaintiff.  *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 210 (5th Cir. 2010); *Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007).

The Supreme Court, however, has declared that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678 (internal citation omitted).  Moreover, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and "[t]he plaintiff must plead enough facts to state a claim to relief that is plausible on its face."  *Guidry*, 512 F.3d at 180 (quotation marks omitted).  The United States Supreme Court also has explained:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Iqbal*, 556 U.S. at 678 (citations and quotation marks omitted).

In determining whether a complaint states a claim that is plausible on its face, the court "draw[s] on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.  Thus, as mentioned above, to avoid dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  In order for a claim to be plausible at the pleading stage, the complaint need not strike the reviewing court as probably meritorious, but it must raise "more than a sheer possibility" that the defendant has violated the law as alleged.  *See Id*. Furthermore, the factual allegations must be "enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

The United States Fifth Circuit Court of Appeals has held that, when reviewing *pro se* complaints, the court must employ less stringent standards. *Bohannan v. Doe*, 527 F. App'x 283, 2013 WL 2631197, at *4 (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)) (Table, Westlaw). In the prisoner context, in *Taylor v. Gibson*, 529 F.2d 709 (5th Cir.1976), the Court explained:

> It is the responsibility of the courts to be sensitive to possible abuses [in the prison systems] in order to ensure that prisoner complaints, particularly pro se complaints, are not dismissed prematurely, however unlikely the set of facts postulated. An opportunity should be provided [to] the prisoner to develop his case at least to the point where any merit it contains is brought to light.

*Id.*, 529 F.2d at 713-14; *see also, Estelle*, 429 U .S. at 106.

## III.   Analysis

### A.   Frivolous Review

Before proceeding to the defendants' motion to dismiss, the Court is called upon to conduct its statutory review for frivolousness of this *in forma pauperis* complaint under 28 U.S.C. § 1915 *et seq.* and 42 U.S.C. 1997e. As outlined above, Dauzat filed this complaint raising claims of deliberate medical indifference against each of the defendants under § 1983.

#### 1.   Dauzat's Claims Against Warden Robert Tanner

Dauzat has sued Warden Robert Tanner as a supervisory figure over the prison. Dauzat claims that under the theory of respondeat superior, Warden Tanner is the proximate cause of his condition for failing to take corrective action over the medical staff.

A supervisory official, like Warden Tanner, cannot be held liable pursuant to § 1983 under any theory of respondeat superior simply because an employee or subordinate at the prison allegedly violated the plaintiff's constitutional rights.  *See Alton v. Tex. A&M Univ.*, 168 F.3d 196, 200 (5th Cir. 1999); *see also Baskin v. Parker*, 602 F.2d 1205, 1220 (5th Cir. 1979). Warden Tanner may only be liable under § 1983 if he "was personally involved in the acts

causing the deprivation of his constitutional rights or that a causal connection exists between an act of the official and the alleged constitutional violation." *Douthit v. Jones*, 641 F.2d 345, 346 (5th Cir. 1981); *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir. 1998) (citing *Sims v. Adams*, 537 F.2d 829, 831 (5th Cir. 1976)); *see also Watson v. Interstate Fire & Cas. Co.*, 611 F.2d 120 (5th Cir. 1980). This personal involvement also must include a showing of deliberate indifference. *See Farmer v. Brennan*, 511 U.S. 825, 828 (1994).

Dauzat does not allege that Warden Tanner was present for, or personally involved in, his medical care or that he suffered any injury as a result of any directive by him which could create vicarious liability. *See Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 1991); *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 124-25 (1988); *Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir. 1996).

Based on the foregoing, Dauzat's § 1983 claims against Warden Tanner are frivolous and otherwise fail to state a claim for which relief can be granted pursuant to 28 U.S.C. § 1915(e) and § 1915A and 42 U.S.C. § 1997e.

### 2.    Dauzat's Claims Against Dr. McVea, Nurse Buckley and Bessie Carter

Dauzat sued Dr. McVea, Nurse Buckley, and Carter in their official and individual capacities for deliberate medical indifference. For the reasons assigned below, the Court finds that Dauzat's claims against Dr. McVea, Nurse Buckley, and Carter are not frivolous because he states claims for deliberate medical indifference that have an arguable basis in law and fact.

The standard of conduct for providing medical care to inmates under the Eighth Amendment was clearly established by the Supreme Court in *Estelle v. Gamble*. In *Estelle*, the Court held that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," proscribed by the Eighth Amendment. 429 U.S. at

104.  This is true where the indifference is manifested by prison doctors in their response to the prisoner's needs.  It is also true where the indifference is manifested by prison officials in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.  *Id.*  In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evince deliberate indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.  *Id.* at 106.

"Deliberate indifference" means that a prison official is liable "only if he knows that inmates face a substantial risk of serious harm and [he] disregards that risk by failing to take reasonable measures to abate it."  *Farmer*, 511 U.S. at 847.  The *Farmer* definition applies to Eighth Amendment medical claims.  *Reeves*, 27 F.3d at 176.  Thus, an inmate must satisfy two requirements to demonstrate that a prison official has violated the Eighth Amendment.  "First, the deprivation alleged must be, objectively, 'sufficiently serious'; a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'"  *Farmer*, 511 U.S. at 834 (quotation omitted).  The plaintiff must show that defendants "exhibited deliberate indifference to his serious medical needs."  *Cooper v. Johnson*, 353 F. App'x 965, 967 (5th Cir. 2009) (citing *Wilson v. Seiter*, 501 U.S. 294, 297, 111 S. Ct. 2321 (1991)); *accord Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999); *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993).

Second, a plaintiff must establish that the defendant possessed a culpable state of mind. *Farmer*, 511 U.S. at 834 (citing *Wilson*, 501 U.S. at 298).  A prison official cannot be held liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.* at 837.  "Such a showing

requires the inmate to allege that prison officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009); *Bohannan*, 2013 WL 2631197, at *6 (citing *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006)). "'Subjective recklessness,' as used in the criminal law, is the appropriate test for deliberate indifference." *Norton v. Dimazana*, 122 F.3d 286, 291 (5th Cir. 1997) (quoting *Farmer*, 511 U.S. at 838–40).

Dauzat's claims against Dr. McVea, Nurse Buckley, and Carter plead both requirements under *Farmer*: (1) they deprived Dauzat of medical care that was objectively and sufficiently serious, and (2) they subjectively knew of and disregarded the risk by refusing to treat him and ignoring his complaints.

For Nurse Buckley, Dauzat claims that she had deliberate medical indifference when she failed to immediately refer him to a physician when his symptoms indicated that he had a severe condition, which could have resulted in paralysis. In Dauzat's complaint, he alleges that he injured himself when he fell on his back while playing basketball in the RCC's wellness program. He alleges that after experiencing numbness in his extremities and severe pain in his neck and back he made a Self-Declared Emergency request and was transported to the facility's infirmary. According to Dauzat's complaint, after taking his vital signs, Nurse Buckley expressed that nothing was wrong and that there was no emergency because he probably just pulled a muscle. Dauzat alleges that Nurse Buckley did not give him any pain medication but sent him back to the wellness program, which may have exacerbated his injury. Two weeks later, Dauzat alleges that he became unconscious and was examined by Nurse Buckley for a second

time. Once again, according to Dauzat, she took his vital signs and dismissed him without any pain medication or diagnosis.

It was not until three weeks after his initial accident that Dauzat was placed on Doctor Call to see Dr. McVea, which occurred after he was seen by a different nurse in the infirmary. The following day, Dauzat was examined by Dr. McVea and was immediately transported to the hospital to be examined by a neurologist where it was determined that he needed immediate neurosurgery. Dauzat alleges that the neurologist informed him that if he did not have immediate surgery his condition could result in paralysis.

As for Dr. McVea and Carter, Dauzat does not claim deliberate medical indifference for the time preceding his surgery, but alleges deliberate medical indifference post-surgery when he was denied access to necessary physical therapy. Dauzat alleges that a month after his surgery, the neurologist ordered that he receive physical therapy after learning Dauzat was not participating in any form of physical therapy. Dauzat alleges that after his appointment with the neurosurgeon, Dr. McVea instructed him to squeeze a clay putty ball for fifteen (15) minutes at night in his cell. Dauzat alleges that he inquired about attending physical therapy and a nurse stated that the putty ball was his therapy and that he would not go offsite for physical therapy.

Once again, Dauzat inquired about therapy in a letter to Carter, the Director of Nursing.[44] On June 3, 2013, Dauzat alleges that he received a letter from Carter indicating that a referral for physical therapy was made and sent to the Review Committee at Interim LSU Hospital, but LSU no longer approved appointments for physical therapy. Carter states in the letter that Dauzat is in the offender facilitated wellness program and that Dr. McVea said he could do his physical therapy there.[45] Dauzat claims that the wellness program is not overseen by medical

---

[44] *See* R. Doc. 1, at 23.

[45] *Id.* at 22.

professionals who could instruct and guide him on appropriate therapeutic exercises and to ensure that he does not injure himself after undergoing a serious spinal cord surgery. The record does not demonstrate that Carter, as the Director of Nursing and a trained registered nurse, sought further physical therapy options for Dauzat knowing the seriousness of his surgery and the risk of him attending the wellness program.

These facts clearly allege that Nurse Buckley, Dr. McVea, and Carter knew that Dauzat faced a substantial risk of serious bodily harm and disregarded that risk by failing to take reasonable measures to abate it. *Gobert*, 463 F.3d at 346 (quoting *Farmer*, 511 U.S. at 847). According to Dauzat's complaint, he saw Nurse Buckley two times and complained of symptoms that should have put her on alert to a serious medical condition; rather, she simply dismissed him and did not inquire further into his illness or refer him to a doctor. Dr. McVea, according to Dauzat, knew he needed physical therapy after his surgery but didn't follow the neurosurgeon's orders and ignored Dauzat's requests for physical therapy, despite the seriousness of his condition. As the Director of Nursing, Carter's letter demonstrates that she knew of Dauzat's need for physical therapy, and similar to Dr. McVea, did not seek physical therapy at another location after LSU rejected the physical therapy. *See Johnson v. Johnson*, 385 F.3d 503, 526 (5th Cir. 2004) (finding that the supervisory figure took appropriate administrative steps after receiving a letter from an inmate by referring the matter for further investigation).

Thus, the Court finds that the facts Dauzat alleges against Nurse Buckley, Dr. McVea, and Carter are enough to state claims for deliberate medical indifference that have an arguable basis in law and fact, thus, Dauzat's §1983 claims against these defendants are not frivolous.

**B.**     **Motion to Dismiss**

The defendants filed a motion (R. Doc. 19) seeking dismissal of Dauzat's claims against them for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and failure to state a claim for which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6). Specifically, defendants claim that the Court lacks subject matter jurisdiction as to Dauzat's requests for injunctive relief and that they are entitled to sovereign immunity. Defendants also argue that Dauzat fails to state a claim for monetary damages because they are entitled to qualified immunity.

**1.     12(b)(1) Lack of Subject Matter Jurisdiction**

The remaining defendants, Nurse Buckley, Dr. McVea, and Carter, seek to dismiss Dauzat's claims against them in their official capacity pursuant to Fed. R. Civ. P. 12(b)(1). The defendants' argument is two-fold. First, defendants argue that Dauzat's claims for injunctive relief to receive an examination by an outside specialist and to receive physical therapy have been satisfied and are moot because there is no longer an ongoing constitutional violation, thus the Court lacks subject matter jurisdiction.[46] Second, defendants argue that Dauzat's claims against them in their official capacity should be dismissed because pursuant to *Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441 (1908), Dazaut no longer has a claim for injunctive relief to overcome the Eleventh Amendment's bar against actions filed against state officers in their official capacities.[47]

---

[46] *See* R. Doc. 19-1, at 1.

[47] *Id.* at 6.

### a.      Dauzat's Claims for Injunctive Relief are Not Moot

Defendants contend that Dauzat's claims for injunctive relief are moot because "no order of this Court could affect the parties' rights with respect to the injunction."[48] Defendants aver that pursuant to the Court's Orders (R. Docs. 11, 16) Dauzat was reexamined by a neurosurgeon on August 4, 2014[49] and examined for the first time by an orthopedist on July 21, 2014.[50] Defendants contend that Dauzat is now part of a new physical therapy program at the Elayn Hunt Correctional Center ("EHCC") in St. Gabriel, Louisiana where he is receiving physical therapy by a certified physical therapist. Defendants acknowledge that the injunctive relief as to the physical therapy may fall under the mootness exception of being "capable of repetition, yet evading review."[51] However, defendants argue that Dauzat can't meet the burden of proof by demonstrating that "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration; and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again."[52]

In opposition, Dauzat argues that his claims for injunctive relief as to the physical therapy are not moot and that the defendants are obligated to provide physical therapy following a serious surgery.[53] Dauzat contends that he continues to suffer with radiating pain, stiffness, and weakness and that his suffering will continue in the future unless he is granted further relief. Dauzat further argues that the physical therapist he saw at EHCC was not helpful. Dauzat claims

---

[48] *Id.* at 3 (quoting *Honig v. Students of California Sch. for the Blind*, 471 U.S. 148, 105 S. Ct. 1820 (1985)).

[49] *See* R. Doc. 19-3, at 21, Dauzat Medical Records, 0574.

[50] *Id.* at 34, Dauzat Medical Records, 0587.

[51] *See* R. Doc. 19-1, at 5 (citing *Libertarian Party v. Dardenne*, 595 F.3d 215, 216-17 (5th Cir. 2010)).

[52] *See id.*; *see also Davis v. Fed. Election Comm'n*, 554 U.S. 724, 735, 128 S. Ct. 2759, 2769 (2008) (explaining the two prongs necessary for the exception to the mootness doctrine).

[53] *See* R. Doc. 20, at 2.

that the physical therapist did not examine him and only demonstrated three (3) exercises after ordering Dauzat to surrender his walker in exchange for a straight cane. Dauzat contends that deliberate indifference would continue in the absence of an injunction. Dauzat does not address or oppose the defendants' contention that his request to be reexamined by a surgeon is moot.

Article III, section 2, clause 1 of the United States Constitution requires the existence of a case or controversy to establish federal court jurisdiction. *Meadows v. Odom*, 198 F. App'x 348, 351 (5th Cir. 2006) (citing *Amar v. Whitley*, 100 F.3d 22, 23 (5th Cir. 1996)). This is known as the justiciability doctrine or case and controversy doctrine, which underpins the mootness doctrine. The mootness doctrine "ensures that the litigant's interest in the outcome continues to exist throughout the life of the lawsuit . . . including the pendency of the appeal." *Id.* (quoting *McCorvey v. Hill*, 385 F.3d 846, 848 (5th Cir. 2004)) (internal quotation marks omitted).

A case is moot under the mootness doctrine if "the requested relief will not redress the defendant's allegedly unlawful conduct," or in other terms, "if [the] litigant will not benefit from issuance of an injunction." *Hernandez v. Cremer*, 913 F.2d 230, 233 (5th Cir. 1990). A case would be considered moot if "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Hornbeck Offshore Servs., LLC v. Salazar*, No. 10-30585, 2010 WL 3219469, at *3 (5th Cir. Aug. 16, 2010) (quoting Erwin Chemerinsky, Federal Jurisdiction 139 (5th ed. 2007)). The party asserting mootness has "[t]he heavy burden of persua[ding] the court that the challenged conduct cannot reasonably be expected to start up again." *Id.* (alternations in original).

However, "[a] case may circumvent the mootness doctrine if the conduct about which the plaintiff originally complained is 'capable of repetition, yet evading review.'" *Hernandez*, 913 F.2d at 233 (quoting *Honig v. Doe*, 484 U.S. 305, 318, 108 S. Ct. 592, 600 (1988)). There is a

two part test to determine if a violation is capable of repetition yet evading review, which requires both parts to be simultaneously present. *See Spencer v. Kemna*, 523 U.S. 1, 17, 118 S. Ct. 978, 988 (1998). The two requirements are "(1) the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again." *Id.* (alternations in original) (quoting *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477–478, 110 S. Ct. 1249, 1254 (1990)) (internal quotation marks omitted).

Under the present circumstances, the Court finds after examining the medical records that Dauzat's claims for injunctive relief are not moot. Dauzat saw an orthopedist on July 21, 2014 and the orthopedist recommended that Dauzat continue using a walker, be referred to neuro physical therapy, and be referred to LSU neurosurgery for a recheck.[54] On August 4, 2014, Dauzat saw a neurosurgeon who noted that Dauzat had complaints of decreased sensation and numbness and recommended that Dauzat return in five (5) to six (6) weeks with CT Myelogram images and CT from an outside hospital on disc.[55] As for physical therapy, Dauzat began physical therapy at EHCC on July 24, 2014.[56] The physical therapist took notes on Dauzat's gait, balance, and flexibility, and then gave him three self-directed exercises to conduct three times a day and instructed him to return in four (4) weeks on August 21, 2014.

Based on the medical records, it is clear that Dauzat's requests for injunctive relief have not been completely satisfied because the neurosurgeon and the physical therapist explicitly ordered follow-ups. Construing Dauzat's complaint broadly, Dauzat's claims for injunctive relief seek more than the initiation of care but the completion of care. If the initiation of care sufficed,

---

[54] R. Doc. 19-3, at 34-35, Dauzat Medical Records, 0587.

[55] R. Doc. 19-3, at 22, Dauzat Medical Records, 0575.

[56] *Id.* at 28, Dauzat Medical Records, 0581.

the defendants would be free to take Dauzat for one visit with the surgeon and physical therapist without taking him to the necessary follow-ups that address his medical needs. This would not only create the potential of repetition of the constitutional violation, but it would evade review without providing Dauzat with the appropriate relief.

Further, given the fact that the defendants only initiated medical treatment pursuant to the Court's Order, the Court is not inclined at this time to proclaim Dauzat's requests for injunctive relief moot. The defendants did not willingly provide Dauzat with the medical care he needed until well over a year after his surgery and upon court order. Under these circumstances, there is still the possibility of prospective injunctive relief that the Court may need to address before the conclusion of this proceeding.

The Court also notes that Dr. McVea declared in his affidavit to the Court that Dauzat will remain in the physical therapy clinic until the physical therapist determines he has reached maximum benefit from the physical therapy.[57] Also, the Court notes that Dr. McVea's affidavit does not address whether Dauzat will be taken to his follow-up appointment with the neurosurgeon.

Thus, the Court finds that Dauzat's claims for injunctive relief are not moot and subject matter jurisdiction still exist.

> **b.     Sovereign Immunity Bars Claims Against Defendant's in their Official Capacity**

Defendants contend that satisfaction of the claimed injunctions establish that Dauzat is no longer claiming an ongoing violation of the Constitution which is necessary to apply the *Ex Parte Young* exception to defendants' sovereign immunity from suits. Defendants argue that sovereign immunity protects them as officials of the state from being sued in federal court in

---

[57] R. Doc. 19-2, at 3.

their official capacity.[58] Defendants concede that the *Ex Parte Young* doctrine is an exception to the sovereign immunity bar, but argue that the mootness of Dauzat's injunctive relief claims render the *Ex Parte Young* doctrine inapplicable.[59]

The Eleventh Amendment to the United States Constitution reads as follows: "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. While unapparent from the text, it is well established that this immunity extends to suits brought against a state by its own citizens. *See Hans v. Louisiana*, 134 U.S. 1, 16–21, 10 S. Ct. 504 (1890). The Supreme Court has repeatedly held that the Eleventh Amendment forbids federal courts from entertaining a suit for monetary damages brought by a citizen against his or her own state. *Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 98, 104 S. Ct. 900 (1984); *Voisin's Oyster House, Inc. v. Guidry*, 799 F.2d 183, 185–86 (5th Cir. 1986). This doctrine of sovereign immunity founded in the Eleventh Amendment has been recognized, applied, and enforced by the United States Supreme Court for over one hundred years to reject suits brought against the various States in federal court.

The Department of Corrections ("DOC") is a department within the Louisiana state government pursuant to La. Rev. Stat. Ann. § 36:401. For Eleventh Amendment purposes, the DOC is considered an arm of the state since any judgment against it or its subdivisions necessarily would be paid from state funds. *Anderson v. Phelps*, 655 F.Supp. 560, 564 (M.D. La. 1985). A state employee, or an employee of a department within the state, sued in his or her official capacity is not considered a person for purposes of suit under §1983. *Will v. Mich. Dep't*

---

[58] *Id.* at 6.

[59] *Id.* at 7.

*of State Police*, 491 U.S. 58, 109 S. Ct. 2304 (1989). Rather, the action would be considered one against the employer, in this case, the State of Louisiana through the DOC. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55, 98 S. Ct. 2018 (1978).

Therefore, a suit against the defendants in their official capacity as employees of the DOC is a suit against the State of Louisiana, which is prohibited by the Eleventh Amendment. *Citrano v. Allen Corr. Ctr.*, 891 F.Supp. 312, 320 (W.D. La. 1995) ("A suit against any state correctional center would be a suit against the state and would thus be barred by the Eleventh Amendment.").

Additionally, unless the State has consented to be sued, sovereign immunity under the Eleventh Amendment bars actions for monetary relief in federal court against a State or state agency. U.S. Const. amend. XI; *Halderman*, 465 U.S. at 100; *Alabama v. Pugh*, 438 U.S. 781, 782, 98 S. Ct. 3057 (1978); *Richardson v. S. Univ.*, 118 F.3d 450, 452 (5th Cir. 1997). Here, the State of Louisiana has not waived its immunity or consented to the exercise of federal judicial power in civil actions against it. La. Rev. Stat. Ann. § 13:5106(A); *Delahoussaye v. City of New Iberia*, 937 F.2d 144, 147 (5th Cir. 1991). Thus, the State of Louisiana is immune from suit in federal court under the Eleventh Amendment.

Although claims for monetary relief filed against the defendants in their official capacity are barred conclusively by sovereign immunity, under *Ex parte Young*, "the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437, 124 S. Ct. 899 (2004) (citing *Ex parte Young*, 209 U.S. 123). This standard allows federal courts to order prospective relief and ancillary relief thereto when a violation of federal law exists. *Id.* (citing *Green v. Mansour*, 474 U.S. 64, 71–73, 106 S.Ct. 423 (1985); *Milliken v. Bradley*, 433 U.S. 267,

97 S. Ct. 2749 (1977); *Edelman v. Jordan*, 415 U.S. 651, 94 S. Ct. 1347 (1974)).  When determining whether the *Ex parte Young* doctrine applies as an exception to the bar against suits filed against an employee in their official capacity, "a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645, 122 S. Ct. 1753 (2002) (quotation omitted).

Having determined that Dauzat's claims for injunctive relief are not moot, the Court finds that the *Ex parte Young* doctrine applies as an exception to the Eleventh Amendment's sovereign immunity. To apply *Ex parte Young* there must be prospective relief and ancillary relief that the Court can order to enjoin a violation of federal law by the state and/or its employees. Here, Dauzat's requests to be seen by a surgeon and to receive physical therapy continue to be prospective relief that the Court can order because Dauzat's treatment is not complete. Therefore, pursuant to the *Ex parte Young* doctrine, the claims Dauzat has against the defendants in their official capacity for injunctive relief are not barred by the Eleventh Amendment.

However, Dauzat's claims against the defendants in their official capacity for monetary relief are barred by the Eleventh Amendment because Nurse Buckley, Dr. McVea, and Carter are employees of the DOC, which is an arm of the state of Louisiana. Any monetary relief sought from the defendants in their official capacity would be paid from state funds, thus they are immune from suit. As such, sovereign immunity applies and Nurse Buckley, Dr. McVea, and Carter are immune from suit in their official capacity as to the claims for monetary relief.

As such, the Court finds that the defendants' motion to dismiss pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction should be denied as to the claims for injunctive relief

against the defendants in their official capacity and granted as to the claims for monetary relief against the defendants in their official capacity.

### 2.      12(b)(6) Failure to State a Claim

In their individual capacity, Nurse Buckley, Dr. McVea, and Carter argue that they are entitled to qualified immunity from Dauzat's claim for monetary relief.

Qualified immunity shields government officials from individual liability for performing discretionary functions, unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. *Colston v. Barnhart*, 130 F.3d 96, 98 (5th Cir. 1997); *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 532-33 (5th Cir. 1997) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity provides for mistaken judgment and protects "all but the plainly incompetent or those who knowingly violate the law." *Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994). A qualified immunity defense is analyzed under a two-step process. *Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388, 393 (5th Cir. 2000); *Hare v. City of Corinth*, 135 F.3d 320, 325 (5th Cir. 1998) (on appeal after remand); *Colston*, 130 F.3d at 99.

The first step is to determine whether the plaintiff has alleged a violation of a clearly established constitutional right under currently applicable constitutional standards. *Jacobs*, 228 F.3d at 393; *Hare*, 135 F.3d at 325; *Coleman*, 113 F.3d at 533. In determining whether a right is clearly established, this Court is confined to precedent from the Fifth Circuit and the Supreme Court. *Shipp v. McMahon*, 234 F.3d 907, 915 (5th Cir. 2000). Therefore, a right is considered to be clearly established if, based on pre-existing law, the unlawfulness of the conduct in question is apparent. *Id.* In other words, the right is clearly established if the "'contours . . . [are] sufficiently clear that a reasonable official would understand that what he is doing violates that

28

right.'" *Id.* (alternations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (other citations omitted); *accord Foster v. City of Lake Jackson*, 28 F.3d 425, 29 (5th Cir. 1994).

When the plaintiff alleges a constitutional violation so as to satisfy the first prong, the second step requires the Court to determine whether defendant's conduct was objectively reasonable under existing clearly established law. *Glenn v. City of Tyler*, 242 F.3d 307, 312 (5th Cir. 2001); *Jacobs*, 228 F.3d at 393; *Foster*, 28 F.3d at 428-29. Officials who act reasonably but mistakenly are still entitled to the defense. Qualified immunity gives ample room for mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law. *Anderson*, 483 U.S. at 641; *Malley v. Briggs*, 475 U.S. 335, 341, 343, 106 S. Ct. 1092 (1986); *Hare*, 135 F.3d at 325. The Court can determine as a matter of law whether a defendant is entitled to qualified immunity and, specifically, whether a defendant's conduct was objectively reasonable. *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000); *White v. Balderama*, 153 F.3d 237, 241 (5th Cir. 1998); *Colston*, 130 F.3d at 99.

The Court finds that Dauzat satisfies the first step and the second step in the qualified immunity analysis because: (1) he states a claim of deliberate indifference that is a clearly established constitutional claim under the Eighth Amendment's proscription against cruel and unusual punishment and, (2) he alleges facts that demonstrate that the defendants' actions were not objectively reasonable.

As noted above in this Court's frivolous review, Dauzat has alleged sufficient facts to state a cognizable claim of deliberate indifference against Nurse Buckley, Dr. McVea, and Carter.[60] Specifically, Dauzat alleges that prior to his surgery, he was examined by Nurse Buckley on two occasions over the course of a four week period and she ignored his constant

---

[60] *See supra* Part III.A.2.

requests to see the doctor and dismissed him from the infirmary without any serious diagnosis or pain medication. As for Dr. McVea, Dauzat has alleged that post-surgery Dr. McVea disregarded the neurosurgeon's order that Dauzat attend physical therapy and ignored Dauzat's multiple requests for physical therapy. Rather, according to Dauzat, Dr. McVea instructed him to squeeze a clay putty ball and ordered him to attend the general wellness program that is facilitated by offenders, which inhibited Dauzat's post-surgery recovery and subjected him to unnecessary pain.  Similarly, based on Carter's letter to Dauzat, Carter did not heed his request for physical therapy knowing the severity of his surgery and did not seek further physical therapy options after LSU rejected the request for physical therapy.

However, now that the Court has determined that Dauzat states a claim of deliberate indifference that is a clearly established constitutional claim, the Court must determine whether the defendants' conduct was objectively reasonable under existing clearly established law. The defendants urge the Court to look at Dauzat's medical records as proof that Nurse Buckley and Dr. McVea acted objectively reasonable and without deliberate indifference.[61]

Defendants argue that the medical records demonstrate that during Dauzat's first visit with Nurse Buckley, she conducted a thorough examination of Dauzat's range of motion and documented all of his complaints.[62] At most, according to the defendants, Nurse Buckley underestimated the severity of Dauzat's condition and misdiagnosed him with a pulled muscle, ligament, or tendon. Defendants argue that Nurse Buckley's misdiagnosis only amounts to negligence and not deliberate indifference.[63] During Dauzat's second visit with Nurse Buckley,

---

[61] The defendants do not direct the Court to the medical records to evince Carter's reasonableness. Furthermore, the defendants did not submit an affidavit or other documents pertaining to Carter's reasonable efforts to address the subjectively known risk to Dauzat's medical care, especially after he sent a letter to her seeking assistance.

[62] *See* R. Doc. 19-1, at 18.

[63] *Id.* at 18-19.

defendants contend that she noted that he complained of not feeling good, nausea, sweating, and stated he passed out. Defendants argue that Dauzat asserted that he needed to lie down and that Nurse Buckley had no reason to disagree with Dauzat's own assessment of his needs.[64]

Defendants further argue that based on the medical records, Dr. McVea also acted reasonable in his decision to not follow the neurosurgeon's order for physical therapy after Dauzat's surgery. Defendants argue that a mere difference of medical opinion does not amount to a deliberate medical indifference claim and that the Eighth Amendment does not mandate a prison doctor to follow the recommendation of another doctor.[65] Defendants assert that Dr. McVea made a referral for offsite physical therapy but it was rejected by LSU, so Dr. McVea provided Dauzat with alternative physical therapy. Defendants contend that Dauzat's medical records do not reflect a mandate that Dauzat receive outpatient physical therapy. Rather, defendants argue, the neurosurgeon ordered "physical therapy daily at facility."[66] Defendants further argue that the medical records do not demonstrate that Dr. McVea ignored or refused orders for physical therapy.

As for Carter, defendants contend that writing a letter to an offender is not objectively unreasonable conduct in light of clearly established law.

After reviewing the medical records, the face of the complaint and its relevant attachments, the Court finds that contrary to the defendants' urging, the defendants did not act objectively reasonable for the purpose of finding qualified immunity at this stage of the litigation. Dauzat's complaint is not the typical disagreement with medical choices or mere delay that often fails under Rule 12(b)(6) review or even the Court's frivolousness review. *See e.g.,*

---

[64] *Id.* at 19.

[65] *Id.* at 23.

[66] *Id.* at 25.

*Gobert*, 463 F.3d at 346 ("Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances."); *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (finding incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference.). Instead, Dauzat has at least alleged facts which would tend to show more than a disagreement and more than just a mere delay.

There is no question from the medical records that Dauzat was not promptly provided urgent care nor appropriate physical therapy after his surgery until the Court issued two orders for additional follow-ups. The records indicate that Dauzat was seen by Nurse Buckley on two occasions, March 17, 2013 and March 31, 2013, and on both occasions she examined him but did not provide any treatment or refer him despite the severity of his complaints, which included numbness in his extremities and pain in his neck.[67] In fact, she notes his request to be sent to the hospital and explicitly notes during his second visit that no treatment was necessary at that time.[68] Four days after his second visit with Nurse Buckley, he was sent to the emergency room and told he needs urgent surgery, which directly contradicts to her assessment that no treatment was necessary.

It is clear that Nurse Buckley saw Dauzat two times and continuously dismissed the severity of his complaints despite his symptoms being more severe than her diagnosis of a strained muscle[69] and indicative of his actual diagnosis of cervical stenosis with myelopathy.[70]

---

[67] *See* R. Doc. 13-2, at 121, Dauzat Medical Records, 0398.

[68] *Id.* at 120, Dauzat Medical Records, 0397.

[69] The pain associated with muscle strain is usually confined to the area injured, and the site injured "become[s] swollen and a bruise may result from bleeding of the torn muscle." After the swelling goes down, "there will be an obvious gap in the muscle when one feels along the muscle." *See* Johns Hopkins Sports Medicine Patient Guide to Muscle Strain, Johns Hopkins Medicine, http://www.hopkinsortho.org/muscle_strain.html (last visited Mar. 3, 2015).

This is not objectively reasonable conduct, especially given the fact that all of the medical professionals Dauzat saw after Nurse Buckley immediately recognized the severity of his condition.

The medical records also demonstrate that after Dauzat's surgery he was not given any form of physical therapy until he was seen by the neurosurgeon on May 20, 2013 and it was ordered that he participate in daily physical therapy at the facility.[71] At that point, according to Dr. McVea's affidavit, Dauzat was instructed on numerous gentle stretching and range motion exercises that he could do at the wellness program, which Dr. McVea admits is "not a physical therapy program but, rather, a fitness program" led by offenders that "are not licensed physical therapist."[72] Five months after surgery, a resident in the neurosurgery clinic at LSU noted on September 16, 2013 that Dauzat still did not have access to physical therapy.[73]

The defendants argue that Dr. McVea's alternative physical therapy was acceptable because the neurosurgeon did not order Dauzat to attend "outpatient" physical therapy and only stated that the physical therapy should be conducted "daily at facility." The Court finds this argument unpersuasive. Regardless of the exact language used by the neurosurgeon, it is clear that Dauzat was ordered to attend *physical therapy* and not a fitness program that was led by non-medical professionals. The mere provision of some medical treatment does not *per se* preclude a finding of deliberate indifference, which can be found when there is evidence of the

---

[70] The symptoms of cervical stenosis with myelopathy include "hand clumsiness, clumsiness of gait, numbness in the hands, jumpy reflexes, a heavy feeling in the legs and difficulty walking, weakness, and, rarely, paralysis." When diagnosing cervical stenosis with myelopathy, healthcare providers "look for limitations of movement in the spine, problems with balance, and signs of pain, as well as any changes in extremity reflexes, muscle weakness, sensory loss, or abnormal reflexes." *See* Cervical Stenosis with Myelopathy, Emory Healthcare, http://www.emoryhealthcare.org/spine/mediecal-conditions/cervical-stenosis-with-myelopathy.html (last visited Mar. 3, 2015).

[71] *See* R. Doc. 13-2, at 75, Dauzat Medical Records, 0352.

[72] *See* R. Doc. 19-2, at 3.

[73] *See* R. Doc. 13-2, at 58, Dauzat Medical Records, 0335.

conscious disregard for a serious medical need. *Blank v. Eavenson*, No. 12-10484/12-10539, 2013 WL 3047124, at *4 (5th Cir. Jun. 19, 2013).

Here, the record is clear that Dr. McVea is a family doctor and that Carter is a registered nurse. Neither professionals are neurosurgeons. The neurosurgeon's order that Dauzat attend physical therapy was based on his professional and specialized assessment after a post-surgery examination. It is unreasonable conduct for Dr. McVea and Carter to not defer to the neurosurgeon's order knowing Dauzat underwent a serious spinal cord surgery to address an injury that could have resulted in paralysis. The seriousness of his surgery necessitated serious post-surgery measures, which were reduced by Dr. McVea's alternative physical therapy at the offender facilitated wellness program. Carter and Dr. McVea took no action to abide by the neurosurgeon's orders after Dauzat's physical therapy was rejected by LSU and did not seek other physical therapy options like the physical therapy Dauzat is now receiving at EHCC.

Based on the foregoing, Dauzat has alleged facts sufficient to state a claim of deliberate indifference to his medical needs and qualified immunity should not attach. The defendants' motion to dismiss as to the claims for monetary relief against Dr. McVea, Nurse Buckley, and Carter in their individual capacity should be denied.

## IV.    Recommendation

It is therefore **RECOMMENDED** that Dauzat's § 1983 claims against Warden Robert Tanner be **DISMISSED WITH PREJUDICE** as frivolous and otherwise for failure to state a claim for which relief can be granted pursuant to 28 U.S.C. §§ 1915(e), 1915A and 42 U.S.C. §1997e.

It is further **RECOMMENDED** that the Motion to Dismiss (R. Doc. 19) filed by Dr. Casey McVea, Nurse Laura Buckley, and Bessie Carter be **DENIED in part and GRANTED in**

**part**. The motion is **DENIED** as to Dauzat's claims for monetary relief against Dr. Casey McVea, Nurse Laura Buckley, and Bessie Carter in their individual capacity and claims for injunctive relief in their official capacity, and is **GRANTED** as to Dauzat's claims against Dr. Casey McVea, Nurse Laura Buckley, and Bessie Carter for monetary damages in their official capacity.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996).

New Orleans, Louisiana, this 19th day of March 2015.


_____

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**