# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

JOSEPH DAUZAT                                          CIVIL ACTION

VERSUS                                                NO:    14-00239

BESSIE CARTER, ET AL.

## ORDER

Before the Court is a **Motion for Summary Judgment (R. Doc. 84)** filed by Defendants, Bessie Carter, Laura Buckley, and Dr. Casey McVea. The motion is opposed. R. Doc. 94. The motion was heard on the briefs.

I.      **Background**

The instant action was filed by Plaintiff, Joseph Dauzat, an inmate at the Rayburn Correctional Center ("RCC") pursuant to Title 42 U.S.C. § 1983 for Eighth Amendment violations regarding inadequate medical care provided by Defendants Bessie Carter ("Carter"), Laura Buckley ("Buckley"), and Dr. Casey McVea ("McVea"). Dauzat alleges he fell while participating in the prison's Wellness Program on March 14, 2013.[1]

The medical records reveal that he was seen in the medical unit after the fall on March 17, 2013, and he was observed to have a limp and his right foot was turned outward. The medical records further show that Nurse Buckley noted that while Dauzat was able to swing both his legs across and up onto the table while lying down, as well as remove his shoes, he complained that his legs from the knee up and his right arm were numb or exhibited paresthesia, which usually arises from nerve

---

[1] R. Doc. 1.

damage. Nurse Buckley characterized Dauzat's neck pain as an afterthought.[2] Dauzat requested the opportunity to be evaluated at a hospital because his pain was worsening despite the medications he had been given, but was instead sent back to his dorm."[3]

On March 31, 2013, Dauzat's medical records evince that he was again seen on an emergency basis by Nurse Buckley. During this visit he complained that he was not feeling well and suggested that he needed to lie down. Nurse Buckley noted that Dauzat complained of nausea, sweating, and that he had recently passed out. Dauzat also advised Nurse Buckley that he is still having the same problem from his last visit. On examination, Nurse Buckley concluded that Dauzat did not appear to be in any apparent distress at the time of his visit. She noted that he was alert, oriented, and stable. She noted that his lungs were clear, he was not sweating, his pupils were equal and responsive, and there were no sign or symptom of nausea and vomiting. She concluded that no treatment was necessary and he returned to the dorm.[4]

On April 3, 2013, Dauzat was seen by the medical department at RCC. During this visit Dauzat's complaints increased to include numbness in his feet, his hands, and in his legs. He complained that these symptoms had begun three to four weeks earlier.[5] He alleges that the problem progressed to his left hand one week earlier, and that he could no longer feel his feet, which makes walking difficult. Dauzat complained of shocking pain in his back and neck that traveled down to his feet whenever he bent his neck.[6] The evaluating nurse observed that he had an awkward gait,

---

[2] *See* R. Doc. 13-2, p. 121, Dauzat Medical Records, 0398.

[3] *Id.*

[4] *Id.* at p. 120; Dauzat Medical Records, 0397.

[5] *Id.* at p. 119; Dauzat Medical Records, 0396.

[6] *Id.*

but that he had equal strength in both hands. The nurse also found that Dauzat had difficulty using his hands and could not write well.[7]

On April 4, 2013, Dauzat was seen by Dr. McVea, who recorded a history of syncopal or fainting episodes on December 20, 2012, December 24, 2012, and January 30, 2013. Hypertension was noted on all of these occasions. The doctor also noted that on all these occasions Dauzat complained of progressive numbness and weakness in his lower extremities, stating that he could not feel his feet when he walked. Dauzat was assessed that day and the doctor noted that neurologically, his ankle reflexes showed sustained clonus[8] on forced dorsiflexion of the ankle. His gait was markedly ataxic[9] while he tried to "feel" for the floor. The doctor also noted that upon examination, Dauzat had decreased strength in all of his extremities.

After examining him, the doctor issued orders for Dauzat to be transferred immediately to the Emergency Room at the Louisiana State University Hospital ("LSU") due to his experience of syncopal or fainting episodes.[10] He was evaluated at the LSU Health Interim Public Hospital as a result of his complaint of weakness and decreased sensation to his hands and his feet.[11]

At this time, Dauzat was diagnosed with significant, severe stenosis of his cervical spine. He was seen by the neurosurgery department and evaluated for possible surgery. Dauzat also obtained an MRI, which revealed that he had congenital narrowing of the AP diameter of the Spinal Canal with multi-level posterior disc bulges producing regions of severe canal stenosis, cord contact and

---

[7] *Id.* at p. 120.

[8] A clonus is a muscular spasm that involves a series of involuntary, repeated or rhythmic contractions and is often the sign of a neurological condition. https://en.wikipedia.org/wiki/Clonus (May 8, 2018).

[9] Ataxia/ataxic is a neurological sign consisting of a lack of voluntary coordination of muscle movements that include gait abnormalities. https://en.wikipedia.org/wiki/Ataxia (May 8, 2018).

[10] *Id.* at p. 109; Dauzat Medical Records, 0386.

[11] *Id.* at p. 107; Dauzat Medical Records, 0384.

cord signal alterations, consistent with myelomalacia/cord edema[12] which was representative of critical stenosis.[13]

As a result of the diagnostic tests and his evaluation, Dauzat was prescribed medication for his pain, as well as recommended for surgery of his cervical spine by the neurosurgeon. The neurosurgeon noted that there should be fall precautions and close follow-up of Dauzat along with the administration of his pain medication.

On April 5, 2013, Nurse Temples (a.k.a. "Nurse Wheat") noted that she attempted to get in contact with the neurosurgeon but was advised that he would not be in a position to see Dauzat until April 19, 2013. She advised LSU about the urgent nature of the situation, and also sent an email to the Wardens regarding the same. Dauzat was thereafter seen on April 15, 2014, for a neurosurgery consult and instructed to return on May 6, 2013.[14] He was diagnosed with a disorder of the spinal cord in the neck.[15]

Dauzat was scheduled for a posterior cervical laminectomy and fusion. Due to his condition, his surgery was pushed up, and the procedure was completed on April 23, 2013. Dauzat's surgery consisted of a C3-C6 posterior laminectomy and fusion.

Dauzat had a post-operation visit on May 20, 2013, where he complained of some neck, and residual right arm pain, as well as leg weakness or paresthesia, more so on the right side.[16] The post-

---

[12] Myelomalacia is a pathological term referring to the softening of the spinal cord. Hemorrhagic infraction of the spinal cord can occur as a sequel to acute injury such as that caused by intervertebral disc extrusion. This condition causes impairment of motor function in the lower extremities, below normal or absence of reflexes of the pelvic limbs and anus, loss of deep pain perception toward the coccyx to the site of spinal cord injury, muscular atrophy or wasting away of muscle tissue depressed mental state and respiratory difficulty due to muscles that run between the ribs and diaphragmatic paralysis. http://en.wikipedia.org/wiki/Myelomalacia, 07/01/14.

[13] *See* R. Doc. 13-2, p. 110; Dauzat Medical Records, 0387.

[14] *Id.* at p. 105; Dauzat Medical Records, 0380.

[15] *See* R. Doc. 13-2, p. 101; Dauzat Medical Records, 0378.

[16] *Id.* at p. 75; Dauzat Medical Records, 0352.

operative orders required Dauzat to receive physical therapy daily at the facility, and required the administration of ibuprofen and Neurontin. Dauzat was also instructed to return for a post-operation visit in six months.[17]

The medical records evince that Dr. McVea accepted the post-operation orders, but later changed the order requiring daily physical therapy at the facility to Bogalusa Community Medical Center ("BCMC") for Physical Therapy.[18]

Dauzat inquired about physical therapy with the doctor and was advised that RCC did not have physical therapy services available at that time. Dr. McVea instructed Nurse Temples to inform Dauzat to begin participating in the wellness program and recommended that he perform gentle range of motion exercises as tolerated along with strengthening exercises.[19]

Dauzat contends that upon returning to RCC and despite doctors' orders he was never provided physical therapy. Instead, he was instructed to squeeze a "putty clay ball," and that upon complaining of the lack of physical therapy to Nurse Bessie Carter was told that the Wellness Program would serve as his physical therapy. Dauzat alleges that the Wellness Program is not instructed by a professional, but only offender facilitators who are not certified in administering physical therapy.[20] As such, Dauzat alleges he was not provided the professional physical therapy as a result of the surgical physicians' orders.

Despite the Wellness Program and the recommended exercise, squeezing the ball, Dauzat's complaint of numbness in his hands and feet as well as neck shoulder and back continued. On July

---

[17] Id.

[18] Id. at p. 74.

[19] Id. at p. 69; Dauzat Medical Records, 0346.

[20] Id.

1, 2013, during a subsequent doctor's visit, Dauzat restated these complaints to the treating physician. The physician noted that while there was residual spasticity,[21] he was referred to physical therapy for rehabilitation training, and he was instructed to rest in his bunk as needed. The record noted that he was ready for discharge on July 1, 2013. His prescription for Ultram and Neurontin were continued.

Dauzat's complaints of numbness continued. He was referred to a medical doctor and awaited an appointment on August 29, 2013. On August 28, 2013, Dauzat was seen after being involved in a fight. He denied injuries and he reported that he hit the other inmate because he was afraid. The records from this visit indicate that Dauzat's neck pain was again reported and appeared to be a chronic issue, as he again requested pain medication.[22]

Dauzat was seen by the doctor on August 29, 2013, with complaints of increased pain from the neck down between shoulder blades. Involuntary movement of his arms and legs were also noted. The record further indicates that Dauzat was moved to the Sun Unit on September 3, 2013 and Dauzat complained of increased neck pain and decreased shoulder blade pain. Involuntary movements of the arms and legs were noted. Dauzat complained that spasticity was worse upon awakening.

On observation, Dr. McVea noted that there was spastic gait, increased deep tendon reflex with bilateral decrease of the lower extremities.[23] Dauzat contends that despite his physical limitations he has not been provided with physical therapy such that McVea is deliberately indifferent to his serious medical needs.

---

[21] Spasticity is the continuous contraction of muscles that interferes with normal, movement, speech, and gait. http://www.aans.org/Patients/Neurosurgical-Conditions-and-Treatments/Spasticity (May 8, 2018).

[22] *See* R. Doc. 13-2, p. 61; Dauzat Medical Records, 0338.

[23] *Id.* at p. 59; Dauzat Medical Records, 0336.

The Defendants now seek a summary dismissal of each of the Plaintiff's claims. First, they argue that Dauzat's Eighth Amendment claim fails because he cannot show that considering the objective severity of his medical condition, the Defendants possessed the requisite culpable state of mind entitling them to qualified immunity. Second, the Defendants contend that the volume of medical records alone constitute proof that they were not deliberately indifferent to his serious medical needs. As to Buckley, the Defendants advance the argument that because Nurse Buckley documented the examinations and complaints of Dauzat for the doctor, she did what a nurse was supposed to do and therefore could not be deemed deliberately indifferent to his serious medical needs and is therefore qualifiedly immune.

Regarding Dr. McVea, the Defendants alleged that he was not deliberately indifferent to Dauzat after the surgery. The Defendants contend that Dauzat was provided a self-administered course of physical therapy which was sufficient for the cervical fusion and actually complied with the surgical physician's orders of post-surgical physical therapy.

Regarding Nurse Carter, the Defendants argue she was not deliberately indifferent because she relayed factual information regarding the lack of available physical therapy and did not have authority over referrals.

The Plaintiff has opposed the motion and contends that due to Rayburn's sick call structure Dauzat had no ability to seek care directly from a physician, that such a determination was Nurse Buckley's to make, and that she failed to do so on two occasions despite her subjective awareness of the seriousness of his symptoms.[24] Dauzat contends that Buckley's prior experience as an orthopedic nurse is evidence that she should have been aware that numbness is a significant symptom indicating poor circulation, injury and/or nerve damage and yet all she did was document

---

[24] R. Doc. 94.

the symptom. Dauzat contends that Buckley was deliberately indifferent to his serious medical need because she failed to place him on a medical call  to ensure that he was provided timely access to a medical doctor out  and that her failure to do so contributed to his chronic myelopathy even after his surgery. [25]

As for Dr. McVea, Dauzat contends that the evidence establishes that Dr. McVea was aware of the necessity for post-operative physical therapy, what it was supposed to consist of and that the Wellness Program he developed did not have any actual physical therapy, which clearly is intentional indifference to his medical needs in violation of the Eight Amendment.  Dauzat contends further that Dr. McVea also declined to execute the orders of the surgical doctor and altered the orders to include his Wellness Program.

With regards to Nurse Carter, the Director of Nursing at Rayburn Correctional Center at that time, Dauzat contends that she was subjectively aware of his surgery and also knew that he needed physical therapy. Dauzat contends that Carter was responsible for ensuring that her staff carry out medical orders and take all necessary actions to carry out the orders.  According to Dauzat, Nurse Carter effectively abandoned her responsibility to continue to seek medical care consistent with medically necessary care ordered by Dr. McVea.

## II.    <u>Standard of Review</u>

Under the doctrine of qualified immunity, public officials "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Supreme Court has "mandated a two-step sequence for resolving government officials' qualified immunity claims." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). A court must decide

---

[25] R. Doc. 94, p. 8.

(1) "whether the facts that a plaintiff has alleged ... make out a violation of a constitutional right" and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* Importantly, the Supreme Court held in *Pearson* that courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. At the same time, the Supreme Court recognized that deciding the two prongs in order "is often beneficial." *Id.*

When an official pleads qualified immunity, "the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). However, "[b]ecause this case arises in a summary judgment posture, we view the facts in the light most favorable to [Dauzat], the nonmoving party." *City & County of San Francisco v. Sheehan*, ––– U.S. ––––, 135 S.Ct. 1765, 1769, 191 L.Ed.2d 856 (2015). That is, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [his] favor." *Tolan v. Cotton*, ––– U.S. ––––, 134 S.Ct. 1861, 1863, 188 L.Ed.2d 895 (2014) (per curiam) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

"Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible ..., the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical & Transp., LLC*, 859 F.3d 353, 355 (5th Cir. 2017) (quoting 11 Moore's Federal Practice–Civil ¶ 56.91 (2017)). "This flexibility allows the court to consider the evidence that would likely be admitted at trial ... without imposing on parties the time and expense it takes to authenticate everything in the record." *Maurer v. Independence Town*, No. 16-30673, 2017 WL 3866561, at *3 (5th Cir. Sept. 5, 2017).

# III.  Analysis

## A.  Deliberate Medical Indifference

Dauzat sued Dr. McVea, Nurse Buckley and Carter for deliberate medical indifference. Dauzat claims that Buckley was indifferent to his serious medical need when she failed to refer him to a physician although his symptoms indicated that he had a severe condition that could have resulted in paralysis.  As for Dr. McVea, and Nurse Carter, Dauzat's complaint arises post-surgery where he was denied access to physical therapy as prescribed by the surgical physician.  Dauzat alleges that Dr. McVea's instruction to him to squeeze a clay putty ball for fifteen (15) minutes at night in his cell was insufficient therapy after having had a cervical fusion.  Carter according to Dauzat deferred to Dr. McVea's Wellness Program after learning that LSU would not approve a physical therapy appointment for him.

In *Estelle v. Gamble* the Supreme Court held that it is the government's obligation to provide medical care for those whom it is punishing by incarceration.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). As that Court noted, an inmate is reliant on prison authorities to treat his medical needs such that a denial of care can result in pain and suffering which would not serve any penological purpose. *Id.* The Court, therefore, held that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain'" which is proscribed by the Eight Amendment. *Id.* "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under s 1983." *Id.* at pp. 104-05 (footnotes omitted). The Supreme Court further held that a prison official cannot be held liable, "unless the official knows of and disregards and excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be

drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). However, a prison official's knowledge of a substantial risk of harm may be inferred if the risk was obvious. *Id.* at pp. 842-43.

Under the law a prison official acts with deliberate indifference only if: (1) he knows that inmates face a substantial risk of serious bodily harm; and (2) he disregards that risk by failing to take reasonable measures to abate it. *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006). "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Id.* In order to demonstrate deliberate medical indifference a plaintiff must show that prison officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino v. Texas Dept. Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001).

## A. <u>Nurse Laura Buckley</u>

The record indicates that on March 17, 2013, Joseph Dauzat was seen by Nurse Buckley on an emergency basis after complaining of back and neck pain and numbness from a fall.[26] Buckley's documentation of her assessment on that day indicates that Dauzat was ambulatory but had a limp and his foot was turned out.

The assessment indicates that Dauzat told Buckley that both legs were numb from the knee up, his right arm was numb, his lips were numb, and that he had pain in his neck.[27] Within the same assessment Buckley indicates that Dauzat stated he needs to be sent to the hospital. Buckley noted

---

[26] R. Doc. 94-2, p. 2.

[27] *Id.*

that Dauzat was able to swing both legs up on the table while lying down, was able to lift and hold his legs extended, took his pedal and popliteal pules, had notable grasp to both hands.

Most notably, there is no evidence that Buckley performed a nursing-neurological assessment. Instead, the assessment is marked as a routine call out and a written note was added for Dr. McVea to advise her if Dauzat needed an X-ray.[28] When asked whether she followed up on her note to Dr. McVea of whether an X-ray was needed she stated that she did not.[29]

The record further indicates that on March 31, 2013, Dauzat was seen on a self-declared emergency basis by Buckley, a former orthopedic nurse.[30] The Health Care Request Form indicates that Dauzat complained to an officer he did not feel well and needed to lie down, but the officer insisted that he do a self-declared emergency. Buckley noted that he complained of nausea, sweating, and that he had recently passed out. The record further indicates that Dauzat informed Buckley that he was still having problems from his last visit.

Her assessment indicates that Dauzat's lungs were clear, vital signs were stable, there was no sweating, his pupils were equal and responsive, and there were no signs or symptoms of nausea or vomiting. Again Buckley did not perform a nursing-neurological assessment and she ignored the fact that his earlier symptoms of numbness were still present. It appears that she did not consider the complaints of nausea and vomiting as additional complaints as opposed to independent new complaints. Buckley concluded no treatment was necessary because Dauzat had a scheduled appointment with Dr. McVea on April 10, 2013 and that he ambulated back to the dorm.[31]

---

[28] *Id.*

[29] Deposition of Laura Buckley, pp. 114-15, 120.

[30] R. Doc. 94-2, p. 3.

[31] *Id.*

Buckley confirmed that prior to examining Dauzat she would have had his active chart and looked back to prior complaints where he had complained to Dr. McVea six days before the subject fall of pain radiating down his neck.[32] He however denied fainting at that time.[33] Buckley conceded that she did not focus on Dauzat's complaints of continued numbness on March 31, 2013, because while he was still complaining of the same problems, "…I didn't address that because I was addressing why he came—why he was there." Further, when asked if there was any reason to check to see if there was a change in his grasp strength from the March 17 visit to the March 31, 2013 visit she stated, "It would have told me it was worse, I would have, if he had told me I'm getting worse than what I was; but he said I'm still having the same problems and I documented that he was still having the same problems."[34] Buckley seemingly acknowledged that she did not examine Dauzat despite his continue complaint of the "same problems"; instead she just wrote down what he said.

Upon questioning, Buckley conceded that numbness "could signify that circulation is poor, there's an injury, there's nerve damage."[35] Further, when asked what sort of injuries this could signify she responded, "It's a whole lot of types of injuries. Degenerative injuries, injuries from activities, a fall."[36] However there is no evidence in the record that Buckley examined his extremities for strength, sensations, reflexes or range of motion. In contrast, Dauzat testified during the *Spears* hearing that during his March 31, 2013, assessment Buckley stated that "Oh it's him again. He's faking."[37]

---

[32] Deposition of Laura Buckley, pp. 93-95.

[33] *Id.*

[34] Deposition of Laura Buckley, p. 103

[35] *Id.* at p. 122.

[36] *Id.* at p. 123.

[37] R. Doc. 102, p. 6.

There are clearly genuine issue of material fact for which the jury must decide whether the actions of Buckley were deliberately indifferent to Dauzat's serious medical needs. Further, Buckley is not qualifiedly immune as the Eighth Amendment's obligation to provide adequate medical care is clearly established law. *See Domino*, 239 F.3d at 756.

"When a gatekeeper to emergency care…knowingly disregards a prisoner's complaint's, she acts with deliberate indifference" to that prisoner's medical needs. *Rodrigue v. Morehouse Detention Ctr.*, Civil Action No. 09-985, 2012 WL 4483438, at *6 (W.D. La. Sept. 28, 2012) *aff'd* 557 F. App'x. 341 (5th Cir. 2014). "A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Gobert*, 463 F.3d at 345 n.12 (citing *Hill v. Dekalb Regional Youth Detention Center,* 40 F.3d 1176, 1187 (11th Cir.1994), *abrogated on other grounds by Hope,* 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666). The motion for summary judgment must be denied as to Nurse Buckley.

**B.  Dr. Casey McVea**

Dr. Casey McVea, a doctor with RCC since 2012, is as a physician and medical director responsible for patient care in addition to administrative duties which included attending meetings, as well as reviewing and implementing policies.[38]

The evidence indicates that on April 3, 2013, Dauzat was assessed by nurses, other than Nurse Buckley, and complained of being barely able to walk or use his hands and feet, and his legs were numb. Dauzat indicated he needed an MRI, he was in bad condition, and was worried about permanent injury.[39] As part of the assessment done on April 3 the nurse noted that Dauzat

---

[38] *Id.* at pp. 31-32.

[39] R. Doc. 94-2, p. 4.

complained of being unable to write well and shocking pains when he bends his neck and eats.[40] Based on the severity of the complaint, McVea evaluated Dauzat on April 4, 2013.[41] In the assessment McVea conducted a neurological assessment and found that Dauzat had increased, unusual deep tendon reflexes, the Plaintiff's ankle did not exhibit normal motions, he had an ataxic gait, and strength was decreased in all extremities.[42] In his doctor's call assessment McVea writes that there are "Rapidly progressing neural deficits of unknown etiology" and sent Dauzat to the Emergency Room for an in-patient neurological work-up.[43]

Dauzat was thereafter diagnosed with significant, severe stenosis of his cervical spine after being evaluated by the neurosurgery department. His evaluation resulted in a finding after MRI of congenital narrowing of the AP diameter of the spinal canal with multi-level posterior disc bulges producing regions of severe canal stenosis, cord contact and cord signal alterations, consistent with myelomalacia/cord edema which was representative of critical stenosis.[44] As a result of the diagnostic tests and his evaluation, Dauzat was prescribed medication for his pain and recommended for surgery of his cervical spine by the neurosurgeon. The neurosurgeon noted that there should be fall precautions and close follow-up of Dauzat along with the administration of his pain medication.

A few weeks later, on April 23, 2013, Dauzat had a C3-C6 laminectomy and fusion. On May 20, 2013, Dauzat had a post-operation visit at which time the neurosurgeon ordered Motrin and Neurontin, a return visit in six months, and physical therapy daily at the facility.[45] Upon Dauzat's

---

[40] *Id.*

[41] R. Doc. 94-2, pp. 5-6; Deposition of Casey McVea, pp. 129-137.

[42] R. Doc. 94-2, p. 5.

[43] *Id.*; Deposition of Casey McVea, p. 139-40.

[44] R. Doc. 13-2, p. 110.

[45] R. Doc. 13-2, p. 75.

return on the correctional center, May 20, 2013, McVea accepted the orders with the following change: "Refer to BCMC for PT", which means refer to Bogalusa Community Medical Center for physical therapy.[46] However, Dauzat never made it to Bogalusa Community Medical Center despite Dr. McVea modification of the orders.

Dr. McVea has final say as to whether the off-site doctors treating recommendation are accepted and if any changes need to be made he could make substitutions or changes.[47] When asked about referrals and requests from sub-specialists, McVea stated he would review the request and 99 times out of 100 he would sign off on it.[48]

Generally, off-site referral administration and scheduling was handled by RCC's program coordinator, Nurse Lesley Wheat. Dr. McVea testified that referrals from RCC at the time had to go to LSU as RCC's main referral, tertiary care source which is contradicted by his hand referral notation.[49] Nurse Wheat testified that non-emergency referrals were limited to UMC in New Orleans and as a matter of practice this was the only facility that accepted RCC's inmates.[50] Dr. McVea further stated that it was the decision of LSU to either schedule an appointment or not and that all he could do was request.[51] Dr. McVea indicated that he would generally accept referrals for physical therapy.[52] McVea states if he learned someone wasn't getting physical therapy he would want to know why no appointment had been scheduled if it's been an unreasonable length of time.[53]

---

[46] R. Doc. 94-2, p. 8.

[47] Deposition of Casey McVea, p. 66.

[48] *Id.* at p. 53.

[49] *Id.* at p. 54.

[50] Deposition of Lesley Wheat, pp. 35, 42.

[51] Deposition of Casey McVea, pp. 54-56.

[52] *Id.* at p. 96.

[53] *Id.* at p. 97.

When asked about his opinion of what would be an unreasonable length of time, he stated, "Well, if it's a post-op case, it would probably be fairly soon."[54]

Nurse Wheat testified that she called BCMC to schedule physical therapy, but no services were available, that McVea did not ask her to look elsewhere for physical therapy services, and that she did not attempt to find any other location because it was not her decision to make.[55] The record shows that on June 4, 2013, Nurse Wheat discussed the order for physical therapy with the patient and doctor, indicated that no physical therapy services were available at the time, and that McVea instructed her to inform Dauzat to begin participating in RCC's Wellness Program to do gentle range-of-motion exercise on his own as tolerated along with strengthening exercise, which was passed along to Dauzat and who acknowledged understanding the information.[56]

The record further indicates on May 28, 2013, Dauzat sent a letter to Nurse Bessie Carter asking when he would receive physical therapy and stated that the only therapy he was receiving was squeezing a clay dough ball for several minutes and was told that would be the extent of the therapy.[57] Nurse Carter sent a letter back stating that LSU was no longer approving appointments for physical therapy and that since he was in the Wellness Program Dr. McVea stated that he could do his therapy there.[58]

McVea testified that when no physical therapy services are available "we have to go to plan B. We did have the facilities available for him to do exercises. Now, granted, it wasn't structured physical therapy with a therapist. But at the time, that's what we had, until we could get him a

---

[54] *Id.*

[55] Deposition of Lesley Wheat pp. 87-89.

[56] R. Doc. 94-2, p. 9.

[57] *Id.* at p. 11.

[58] *Id.* at p. 12.

therapist."[59] McVea stated that he would have "absolutely" continued to seek some sort of more formalized therapy but he failed to provide any insight as to the additional formalized therapy he sought for Dauzat.[60] However, there is no evidence that Dauzat was ever provided some form of physical therapy until more than a year after surgery.

McVea described the Wellness Program, in which "offender facilitators" assisted the inmates with exercise and served as motivators for the other inmates.[61] The evidence shows that the RCC directives indicate that the facilitator would provide wellness information approved by the Medical Director and maintain a daily log of the progress of each participant.[62] The directive also indicates that participation would also be monitored by medical staff through regular examinations suggesting there was no medical staff overseeing the program on a daily basis.[63] McVea also acknowledged that the program provided no formal physical therapy.

Nurse Lesley Wheat confirmed that Dauzat did not meet with a physical therapist to receive training on how to do physical therapy exercises at the RCC facility, but that according to her documentation he was instructed on exercises presumably by the facilitator inmate.[64] Wheat confirmed that facilitator inmates in the program did not teach the other inmates how to do exercises or stretches.[65] Wheat told Dauzat what exercises to do after looking up the exercises on the

---

[59] Deposition of Casey McVea, p. 150.

[60] *Id.* at p. 152.

[61] *Id.*

[62] R. Doc. 94-8.

[63] *Id.*

[64] Deposition of Lesley Wheat, p. 92.

[65] *Id.* at p. 93

internet.[66] Wheat further testified that she was not a licensed physical therapist or trained to teach a person to do their own physical therapy.[67]

McVea confirmed that no one associated with the Wellness Program designed the exercise programs, instead Dauzat would have been told to do range of motion exercises, which are not hard to figure out. McVea further responded, "But strengthening exercises—to answer your question, I don't know who was instructing him on this. I would assume he was getting some help from our facilitators to help do exercises he could do."[68] McVea further acknowledged that he did not design any exercises to specially address muscles weakened in the course of the operation because they are "not physical therapists."[69]

McVea indicated that physical therapists are healthcare professionals who are specifically trained to identify areas where a person could improve mobility and function and train people how to do those exercises to improve their health.[70] According to McVea a "physical therapist is somebody who can show specific exercises to strengthen specific muscle groups to help alleviate certain symptoms," and that "After surgery, the muscle groups are weakened just by the fact of surgery.[71] So physical therapists do focused exercises for specific muscle groups that are weakened

---

[66] *Id.* at p. 96.

[67] *Id.* at p. 95.

[68] Deposition of Casey McVea, p. 150.

[69] The Defendants have provided an affidavit of Dr. Robert Everett, a neurosurgeon, that the gentle range of motion and strengthening exercises were sufficient to satisfy the physical therapy element of post-operative healing and could have been self-administered without addressing the sufficiency of squeezing a clay ball for a cervical laminectomy and the lack of instructions by a licensed and trained physical therapist.

[70] *Id.* at p. 91.

[71] The Court notes here that it is not considering the expert report provided by the Plaintiff as part of this order as the Court finds it to not be competent summary judgment evidence as it was not sworn or certified.

after surgery as well."[72] When asked if physical therapy helps post-operatively with healing McVea stated, "Well, it assists the patient in getting back to their maximum level of function. It might not be complete normality, but it is their maximum level of functioning."[73]

McVea acknowledged that it was his responsibility to know the "menu of options" for treatment and to know what else is available in the state for prisoner physical therapy.[74] On July 1, 2013, McVea's call notes indicate "Re-refer to PT for rehab training."[75] McVea then requested a consult for physical therapy on that day.[76]

On September 16, 2013, medical records show that Dauzat was seen again at LSU by a physician who noted he continued to complain of persistent right upper extremity and left-hand paresthesia, neck pain radiating to shoulders, and bilateral lower extremity pain.[77] It was noted that Dauzat had not had physical therapy secondary to incarceration but was now ambulating, or walking, with a walker and denies falls.[78] Plaintiff at that time was instructed on safe exercises to do in the absence of physical therapy.[79]

Dauzat complained of numbness, difficulty walking, radiating pain in the neck and lower extremity continued through January 2014 at which time he was given a knee brace for his right knee.[80] On March 5, 2014, Dauzat was seen at Elayn Hunt Correctional Center for a CT of the neck

---

[72] *Id.* at p. 92.

[73] *Id.* at p. 93.

[74] *Id.* at pp. 24, 159.

[75] R. Doc. 13-2, p. 64.

[76] *Id.* at pp. 65-66.

[77] R. Doc. 13-2, p. 58.

[78] *Id.*

[79] *Id.*

[80] R. Doc. 13-2, pp. 47-57.

without contrast.[81] On March 17, 2014 a telemed assessment was done. The telemed doctor noted that a CT of the C-Spine was completed, and it was noted that the decompression looks very good, the instrumentation was in position, alignment was good, the fusion looked good and he was overall doing well with no need for continued follow up. The doctor noted that he could return if there were problems.[82]

A report by radiologist Dr. Hudkins on March 5, 2014, concluded that there were degenerative changes with mild narrowing of the neural foramina from C7 to T2. He further noted the presence of lucence across the bilateral C7 inferior articulating processes, which he concluded were likely unfused old fractures with secondary degenerative changes and recommended that a clinical correlation take place. On March 17, 2014, Dauzat was diagnosed with cervical spondylosis[83] with myelopathy.[84]

Dauzat's medical records show that the first physical therapy he received was on May 28, 2014 at the Elayn Hunt Correctional Center ("EHCC").[85] During the Plaintiff's very first visit, Tonja Latham, physical therapist, noted that the Plaintiff appeared to be magnifying and exaggerating his symptoms.[86] However, the notes also indicate that Dauzat exhibited an excessive posterior pelvic tilt when standing, that he had excessively flexed knees attributable to severe tightness in his

---

[81] *Id.* at p. 43.

[82] *Id.* at p. 37

[83] Cervical spondylosis is a degenerative disease of the spine. https://www.hopkinsmedicine.org/healthlibrary/conditions/adult/spine_shoulder_and_pelvis_disorders/cervical_spondylosis_134,17 (May 8, 2018).

[84] Myelopathy is a disorder that results from the sever compression of the spinal cord. https://www.hopkinsmedicine.org/healthlibrary/conditions/nervous_system_disorders/myelopathy_22,Myelopathy (May 8, 2018).

[85] R. Doc. 43, Bates 613-14

[86] *Id.*

hamstrings, poor hamstring flexibility, that there were gait pattern deficits of 50%, and that flailing motions indicated pain. The physical therapist issued a straight cane.[87] The Plaintiff's next returned to EHCC's physical therapy clinic on July 28, 2014 where the note indicates he presented with continued functional deficits that appear to be the result of hypochondria via symptom magnification, that he has poor compliance, and that functional improvement required strict adherence to the self-directed regimen. The notes also indicate that Dauzat reported falling while using the straight cane, and was issued a walker as a result. The therapist also indicated that Dauzat was instructed to do squats and hamstring stretches and that his knee bending was the result of severe hamstring tightness. The therapist also instructed Dauzat on exercises that avoid cervical pressure.[88]

While the Court is aware that Ms. Latham is a physical therapist, the records do not indicate that she performed "therapy" in a traditional sense beyond an original evaluation, instructions to Dauzat to perform exercises, and that he should follow the self-directed regime. The records do not seem to indicate the use of any special equipment, other than a cane or walker, or treatment beyond the provision of instructions for Dauzat to follow.

On August 4, 2014 the Plaintiff's medical records show he consulted with a neurosurgeon who recommended a CT myelogram and a return in 5-6 weeks.[89] The physician's impression from the myelogram was there was multilevel degenerative changes present in cervical spine and the post multilevel cervical laminectomy, surgical changes and hardware placements appeared satisfactory. The records further indicate additional diagnostic procedures and treatment in response to complaints as well as treatment and medication for pain management.

---

[87] R. Doc. 43, Bates 613-617.
[88] R. Doc. 43, Bates 581-584.

[89] R. Doc. 43, Bates 574-75.

The court finds that there are genuine issues of material fact as to whether McVea's post-surgical failure to provide physical therapy constitutes deliberate indifference to Dauzat's serious medical needs. *See Domino v. Texas Dept. Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001).. Dr. McVea is not qualifiedly immune because refusal to follow a surgical doctor's orders given the seriousness of the condition may violate the Eight Amendment and constitute deliberate indifference in violation of clearly established law. *See Lawson v. Dallas Cty*, 286 F.3d 257, 263 (5th Cir. 2002) (Holding that the district's Court's findings of deliberate medical indifference were not defective as a matter of law when doctors at outside facilities sent specific orders as to an inmate to jail medical staff, which was not followed despite their knowledge of the seriousness of the condition.); *See also Easter v. Powell*, 467 F.3d 459, 463-64 (5th Cir. 2006) (failure to follow a prescribed course of treatment can constitute a claim for deliberate medical indifference).[90] As such, the motion for summary judgment is denied as to Dr. McVea.

### C. <u>Nurse Bessie Carter</u>

Nurse Carter, the Director of Nursing at RCC during the time period relevant to the instant litigation received a letter from Dauzat requesting information as to when his physical therapy would begin. Carter told Dauzat that UMC was no longer approving appointments for physical therapy and that he could do his physical therapy while incarcerated. Further, during her deposition Carter indicated that "Ultimately it would be my responsibility as director of nurses" to determine and try to find if there were other facilities to get access to medical care for patients but instead she deferred

---

[90] Summary judgment has been denied with respect to delays and failure to provide physical therapy to inmates. In *Stevens v. Goord* the District Court for the Southern District of New York found that the repeated failure to provide prescribed physical therapy treatments combined "with the improper provision of therapy by untrained nurses and inmate assistants demonstrate the existence of a genuine issue of material act sufficient to defeat Defendants' summary judgment motion as to Plaintiff's Eighth Amendment claim." *Stevens v. Goord*, 535 F.Supp.2d 373, 386 (S.D.N.Y. Jan. 22, 2008). The Court in *Stevens* also denied qualified immunity as well. *Id.* at 389.

to Dr. McVea and his decision to place Dauzat in the Wellness Program. Carter acknowledged that she was familiar with the Wellness Program established by Dr. McVea and that to her understanding, "it was to get the offenders that were on indoor duty statuses to be able to move around and exercise and do some things that they needed to do to stay healthy."[91] Carter was not aware of the person who was supervising the program other than the Dr. McVea and was unaware of how people got into the program.[92] She indicated further that based on the Wellness Program directive it used trained offender volunteers to work with participants, but she was unaware of what the training consisted of.[93]

When asked as about physical therapy outside of the corrections context, Nurse Carter indicated that "Physical therapy is going to a facility that has the equipment to determine what kind of range of motion or what kind of exercises or what kind of equipment you need to use to strengthen whatever needs to be strengthened and to put you in the best shape you can be put into."[94] She further stated the people at physical therapy would be the ones who guided a patient through the exercises, but was unaware of what training or who would be trained to conduct physical therapy.[95] She stated that when a patient at RCC needed physical therapy they would be referred offsite to the clinic for therapy or if it were to be done onsite they would be instructed on the right procedures.[96] In her letter to Plaintiff, Carter indicated that Nurse Wheat would call from the infirmary to explain this.[97] However, Dauzat was not referred to outside physical therapy.

---

[91] *Id.* at p. 90.

[92] *Id.* at p. 95.

[93] *Id.*

[94] *Id.* at pp. 95-96

[95] *Id.* at pp. 96-97.

[96] *Id.* at p. 97.

[97] *Id.* at p. 129.

The Court finds that genuine issues of material facts exist as to whether Carter's failure to actively seek out physical therapy in compliance with the surgical doctors' orders constitutes deliberate indifference to his serious medical needs. Further, Carter is not entitled to qualified immunity based on these facts. Carter's deferral to the Wellness Program based on the information available to Carter and not following-up on locating physical therapy consistent with the surgical physicians' orders may be deemed objectively unreasonable under clearly established law. As such, the motion for summary judgment must be denied as to Nurse Carter.

IV.   **Conclusion**

Accordingly,

**IT IS ORDERED** that the Defendants' **Motion for Summary Judgment (R. Doc. 84)** is **DENIED.**

New Orleans, Louisiana, this 8th day of May, 2018

**KAREN WELLS ROBY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**